In re NAZI ERA CASES AGAINST GERMAN DEFENDANTS LITIGATION.

This Matter Relates To Simon Frumkin et al.,

v.

JA Jones, Inc. et al.

No. MDL 1337.
Civ. No. 00–5496(WGB).

United States District Court,
D. New Jersey.

March 1, 2001.

Barry Fischer, Los Angeles, CA, for Plaintiff Simon Frumkin.

Bud G. Holman, Kelley Drye & Warren LLP, New York City, for Defendant J.A. Jones, Inc.

Allyn Z. Lite, Lite Depalma Greenberg & Rivas, LLC, Newark, NJ, Liaison for Plaintiffs.

John J. Gibbons, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, A Professional Corporation, Newark, NJ, Liaison for Defendants.

## OPINION

BASSLER, District Judge:

Plaintiff Simon Frumkin seeks recovery against Defendants Philipp Holzmann AG, Philipp Holzmann USA, and J.A. Jones, Inc., for damages resulting from his forced labor in Nazi Germany from July, 1944 to April, 1945. The Nazi government contracted with Defendants[1] to construct a secret underground airplane hanger/factory complex during World War II.[2] Plaintiff claims that he and his deceased father were exploited, tortured, starved, and

---

1. In general terms, Defendant Philipp Holzmann AG ("Holzmann AG") is a German company, that during World War II was paid to perform architectural and construction work for the Nazi government. Defendants Philipp Holzmann USA ("Holzmann USA") and J.A. Jones, Inc. ("Jones") are present-day American subsidiaries or branches of Holzmann AG. While only Defendant Jones has been properly served in this action, Plaintiff currently seeks to serve process on the other Defendants. Whether Jones and Holzmann USA can be held liable for the wartime conduct of Holzmann AG is a contested question, and one that the Court need not reach in deciding this motion to dismiss. In the interests of clarity, and for purposes of this opinion only, the Court will treat all three Defendants as if they were a single entity (collectively "Holzmann" or "Defendants").

2. For purposes of this decision the allegations in the pleadings are accepted as true. *Wisniewski v. Johns–Manville Corp.,* 812 F.2d 81, 83 n. 1 (3d Cir.1987)

forced to perform crushing labor by Holzmann in the construction of the complex.

Defendants move to dismiss under FRCP 12(b) on numerous grounds, only two of which are addressed in this opinion: the political question doctrine and international comity. After thorough consideration of the voluminous submissions of the parties and the Statement of Interest filed by the United States government, and after having heard oral argument, this Court concludes that Plaintiff's claims should be dismissed with prejudice. The Court **grants** Defendants' motion, on the grounds that Plaintiff's claims present non-justiciable political questions, and that the Court should decline to exercise jurisdiction in the interests of international comity.

## I. Background

This is the last of more than fifty cases that were consolidated before the Court as the result of a "motion for centralization," pursuant to 28 U.S.C. § 1407, brought before the Judicial Panel on Multidistrict Litigation ("MDL Panel"). (MDL Transfer Order, Docket No. 1337 (August 4, 2000)). In the overwhelming majority of the consolidated cases, Plaintiffs sought voluntary dismissal with prejudice. Voluntary dismissal in those cases was subsequently granted, pursuant to an opinion of the Court dated December 5, 2000. *See In re: Nazi Era Cases Against German Defendants Litigation*, 198 F.R.D. 429 (D.N.J.2000).

In its transfer order, the MDL Panel indicated that common to the actions before the Court were claims against German companies, including banks, insurance companies, and industrial corporations, (collectively "German Industry"), which arose from conduct occurring during the Nazi era. These cases were transferred in light of "an important international agreement which promises to present significant common pretrial issues pertaining to the

settlement or dismissal of the actions." (MDL Order at 2).

The "important international agreement" referred to in the Transfer Order is that embodied in the German Foundation "Remembrance, Responsibility and the Future" ("The Foundation"). The Foundation is the result of a collaboration among American plaintiffs' attorneys, representatives of German Industry, numerous governments including those of the United States, Germany, and Israel, and other non-governmental organizations. The Foundation was designed to provide some measure of compensation to the many surviving · victims of the Nazi era whose claims rest on the conduct of German Industry during that period, and whose claims have allegedly been ignored by prior efforts to compensate victims of Nazi aggression. In exchange for this compensation, surviving victims agree to provide German Industry with legal peace.[3]

As agreed to during negotiations, the Foundation provides that before any victims receive individual compensation, the legal peace promised to German Industry must be secured in the form of dismissal with prejudice of *all* lawsuits brought by victims against German Industry pending in the courts of the United States. Given the unique opportunity presented by the Foundation, the overwhelming majority of Plaintiffs with claims before the Court either noticed or moved for voluntary dismissal of their claims with prejudice. Also in keeping with the goals of the Foundation, Defendant companies have moved to dismiss with prejudice the only action remaining in this Court, namely that brought by Plaintiff Frumkin.

### A. Procedural History

This action was commenced by Plaintiff Frumkin in the Superior Court of California for the County of Los Angeles on April 14, 2000. The action was subsequently

---

**3.** Both the background and mechanics of the Foundation are fully detailed in the Court's December 5th Opinion. 198 F.R.D. 429 (D.N.J.2000).

removed to the Central District of California by Defendants. The basis for removal was jurisdiction pursuant to 1) 28 U.S.C. § 1331 (violations of international treaties, fundamental human rights laws and customary international law); 2) 28 U.S.C. § 1332(a) (diversity); and 3) 28 U.S.C. § 1367 (supplemental jurisdiction).

After removal to the Central District of California, Frumkin's action was transferred to this Court by order of the MDL panel for consolidated pre-trial proceedings, pursuant to 28 U.S.C. § 1407. (MDL Transfer Order, Docket No. 1337 (August 4, 2000)).

### B. Factual History

The grim reality of German Industrial atrocities committed before and during World War II have been well-documented, by scholars and courts alike. Plaintiff's action is typical of those that were before the Court as a result of the MDL Panel's Transfer Order, all of which asserted claims either stemming from the appropriation of property, or from enslavement, torture, and murder by German Industry. In addition to claims for his own slave-labor related injuries, Frumkin has brought a wrongful death action on behalf of his deceased father, who Defendants allegedly worked to death before Plaintiff's eyes.

Frumkin was born in Kovno, Lithuania, on November 5, 1930, and resided there until that city's military occupation in July of 1944 (Complaint, ¶ 1). He and his father were transported to a labor camp in Germany, where they were forced by Holzmann to construct a subterranean aircraft hanger and warplane manufacturing plant. (Complaint, ¶ 12). The Nazi government entered into a contract with Holzmann for the construction of this facility, which was to be used as a locus for the assembly and concealed operation of warplanes for the Luftwaffe. (Complaint, ¶¶ 10, 12).

Following a daily five-mile trek to the construction site from their camp, twenty thousand laborers, including Frumkin and his father, worked 12–hour shifts, seven days a week, in an effort to complete the facility. (Complaint, ¶¶ 13,15). In order to increase productivity, daily beatings and torture were employed, which resulted in the deaths of more than 5,000 slaves at the hands of Holzmann's supervisors. (Complaint, ¶¶ 28–31). Holzmann's slaves faced the constant threat of being killed if they refused to work. (Complaint, ¶ 40).

Plaintiff's father, Nicholas Frumkin, died as a result of his enslavement on April 7, 1945, just 20 days before the camp's liberation. (Complaint, ¶¶ 1, 46). According to Frumkin, the gold dental work in his father's teeth was then pried out of his father's mouth under Defendant's directive. (Complaint, ¶ 1).

### II. Analysis

Defendants have assembled a laundry list of legal theories supporting dismissal of Plaintiff's claims.[4] A number of these legal arguments, each independently justifying dismissal, have recently been relied on by two courts in this District in dismissing the factually similar claims of other slave laborers. *See Burger–Fischer v. De-Gussa AG*, 65 F.Supp.2d 248 (D.N.J.1999) (claims of World War II slave laborers present non-justiciable political questions); *Iwanowa v. Ford Motor Company*, 67 F.Supp.2d 424 (D.N.J.1999)(claims barred by treaty, expiration of statute of limitations,[5] political question doctrine, and international comity).

---

**4.** This matter is presently before the Court on a Motion of All Defendants to Dismiss All Remaining Claims in All Actions With Prejudice as to the Named Plaintiffs, which was filed by Liaison Counsel for the Defendants in all the consolidated cases. Holzmann has joined in that motion, and incorporated by reference the voluminous documentary record that supports the Motion of All Defendants to Dismiss.

**5.** Plaintiff places great weight on a California statute, Cal.Code Civ. Proc. § 354.6, which seeks to toll the limitations period for World

The Court limits this opinion to the two arguments that are inescapably fatal to Frumkin's action; namely that his claims present non-justiciable political questions, and that in the interests of international comity, this Court should decline to exercise jurisdiction over his claims.[6] The Court reaches these conclusions based on the pervasive intervention of the political branches of government into this area over the last 55 years; pervasive intervention which has culminated in the newly-created Foundation "Remembrance, Responsibility, and the Future."

## A. Political Question Doctrine

### 1. Generally

■ The political question doctrine like standing, mootness and ripeness places constitutional and prudential limits on the power of the federal courts to adjudicate certain kinds of claims. *Vander Jagt v. O'Neill,* 699 F.2d 1166, 1178–79 (D.C.Cir.1982). Because the conduct of the foreign relations of our government was committed by the founding fathers to the Executive and Legislative branches, claims which implicate the government's foreign policy may pose political questions. U.S. CONST. art. II, § 2. The political question doctrine in this area is an entirely judicial extension of that fundamental commitment of power to Congress and the President. Courts have held that "the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918). "Properly understood, the political-question doctrine restrains courts from review-

ing an exercise of foreign policy judgment by the coordinate political branch to which authority to make that judgment has been 'constitutional[ly] commit[ted].'" *Goldwater v. Carter,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979)(Brennan, J. dissenting), *quoting Baker v. Carr,* 369 U.S. 186, 211–213, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

■ "[T]he Framers 'did not make the judiciary the overseer of our government.'" *Dames & Moore v. Regan,* 453 U.S. 654, 660, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), *quoting Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 594, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)(Frankfurter, J., concurring). Instead, where adjudication of a dispute would cause a court to resolve "political questions," the proper course for a court is to dismiss the action. *767 Third Ave. Associates v. Consulate General of Socialist Federal Republic of Yugoslavia,* 218 F.3d 152, 164 (2nd Cir. 2000), *quoting Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

■ The application of the political question doctrine is not absolute. *Baker,* 369 U.S. at 211, 82 S.Ct. 691. The doctrine must be cautiously invoked, and the mere fact that a case touches on the political process does not necessarily create a political question beyond courts' jurisdiction. *Nixon v. Herndon,* 273 U.S. 536, 540, 47 S.Ct. 446, 71 L.Ed. 759 (1927); *Can v. United States,* 14 F.3d 160, 163 (2nd Cir.1994). Even so, when a question relates to foreign affairs, courts will be more hesitant to consider certain questions on the merits than when internal operations

War II slave labor claims until the year 2010. While the statute of limitations issue is not reached in this dismissal, the Court notes in passing that the California statute upon which Plaintiff relies is of exceedingly questionable constitutionality. *See Gerling Global Reins. Corp. of America v. Nelson,* 123 F.Supp.2d 1298 (N.D.Fla.2000)(finding an analogous Florida statute violates the legislative prong of the Due Process Clause).

6. While questions of subject-matter jurisdiction are conventionally the first that a court should consider, justiciability is also a threshold question. *See United States v. Sperry Corp.,* 493 U.S. 52, 66, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989). Given the dispositive nature of the Court's justiciability analysis, any jurisdictional questions that may exist in this case need not be reached.

are involved. *Atlee v. Laird*, 347 F.Supp. 689, 696 (E.D.Pa.1972).

In *Baker v. Carr*, the Supreme Court thoroughly analyzed political question jurisprudence, and in the area of foreign relations determined that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." 369 U.S. at 211, 82 S.Ct. 691. Instead, foreign relations decisions have invariably demonstrated "a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." *Id.* at 211–12, 82 S.Ct. 691.

The *Baker* court formulated a test for when an action should be dismissed as non-justiciable because it presented a political question. Justice Brennan, writing for the majority, held that a court should only dismiss an action if at least one of the following six formulations is inextricable from it:

> Prominent on the surface of any case held to involve a political question is [1] found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217, 82 S.Ct. 691.

The political question doctrine does not abrogate the existence of federal judicial power, it merely limits its exercise, so that even if a court has the constitutional power to adjudicate a dispute, if the dispute presents a political question, it should decline to do so. *Atlee*, 347 F.Supp. at 701; *see generally Powell v. McCormack*, 395 U.S. 486, 516–19, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

"Rules of justiciability serve to make the judicial process a principled one," and any decisions arising after a departure from those rules "lack the clarity and force which ought to inform the exercise of judicial authority." *Renne v. Geary*, 501 U.S. 312, 324, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991). Regardless of how compelling Plaintiff's claim is, if it is inexorably linked to the conduct of foreign affairs it presents a political question, and this court must decline to reach the merits.

### 2. Frumkin's Claims

■ To resolve a justiciability issue, a Court should examine the pleadings and the record to determine the nature of the underlying dispute and the interests of the parties in having the dispute resolved. *Renne*, 501 U.S. at 316, 111 S.Ct. 2331. Plaintiff fundamentally misinterprets the nature of the political question doctrine, when he argues that "Defendants rely on *Baker* and claim Plaintiff's claim is a political question. This is just plain wrong. Plaintiff is bringing an individual claim against a private company." (Opposition Brief, p. 36). The issue is not how Plaintiff has styled his suit, but instead what the underlying controversy is.

■ At its heart, the underlying dispute here is one arising from atrocities committed by supporters of and collaborators with the German National Socialist State during World War II. While Plaintiff almost certainly was enslaved by a private company, as opposed to the Nazi government or German military, one need only look to the labor Frumkin was forced to perform (construction of a military airbase) to see that Holzmann's abuse of Frumkin was fundamentally interrelated with the Nazi war

effort. *See In re World War II Era Japanese Forced Labor Lit.*, 114 F.Supp.2d 939, 948 (N.D.Cal.2000)(discussion of Japanese corporate involvement in war effort).

Claims for war reparations arising out of World War II have always been managed on a governmental level, beginning with the Potsdam Agreement[7] which was entered into immediately upon the war's conclusion.[8] This agreement memorialized the dual policy determinations of the Allied governments that reparations should be exacted from Germany to compensate victims to the greatest extent possible, and that in the process Germany should be converted into a non-industrial country that would be unable to again wage war. *Id.*

Essentially, after Potsdam the Allies intended to punitively divest Germany of its remaining public and private industrial base, and convert it into a neutral, pastoral land. At the 1946 Paris Reparation Conference, the United States and seventeen other allied nations met to formulate more specific plans for the extraction and division of German war spoils. The Paris Agreement[9] intended to divide 75% of surviving German assets, including external capital, internal industrial and capital equipment, merchant ships, and monetary gold. As a result of the Paris Agreement, the private industrial base of Germany would be dismantled and proportionally distributed to the Allied nations, in satisfaction of their claims, and the claims of their nationals.[10]

Not long after the Paris Agreement, the increased Soviet threat and start of the Cold War forced the Western Allies to cease their dispersal of the German industrial base, and balance the extraction of reparations with the restoration of a healthy German economy. *See Burger–Fischer*, 65 F.Supp.2d at 264–65; *Iwanowa*, 67 F.Supp.2d at 451–52. A shift by the Western Allies to an anti-communist policy was reflected in the Transition Agreement,[11] which ended both the military occupation of Germany and the direct extraction of reparations. Under the Transition Agreement, responsibility for compensating victims of Nazi oppression was shifted directly to the Federal Republic of Germany. As with the Paris Agreement, the Transition Agreement reserved the final settlement of reparations for an eventual peace treaty.

The 1953 London Debt Agreement[12] was then implemented "to stabilize the German economy and fully integrate it into

**7.** Protocol of the Proceedings, Berlin (Potsdam) Conference,(the "Potsdam Agreement"), Aug. 2, 1945, 3 Bevans 1207.

**8.** Both *Iwanowa*, 67 F.Supp.2d at 447–56, and *Burger–Fischer*, 65 F.Supp.2d at 265–72, fully recount the implementation and effect of all the important post-World-War-II treaties and agreements with Germany. Rather than duplicate this substantial effort, this opinion touches on the critical treaties in only the most general terms. For an account of how the same process of reparations and restitution was undertaken in Japan, see *In re World War II Era Japanese Forced Labor Lit.*, 114 F.Supp.2d 939 (N.D.Cal.2000).

**9.** Agreement on Reparation from Germany on the Establishment of an Inter–Allied Reparation Agency and Restitution of Monetary Gold, Jan. 14, 1946, (the "Paris Agreement"), 61 Stat. 3157, T.I.A.S. 1655.

**10.** The Paris Agreement was not intended to resolve all reparations issues, but instead reserved final settlement for an eventual multilateral peace treaty. Unlike the Japanese theater, where a final peace treaty was signed immediately following the war, *see Japanese Forced Labor Lit.*, 114 F.Supp.2d at 946, a final peace treaty with Germany was delayed until German reunification in 1990. (Treaty on the Final Settlement with Respect to Germany (the "2 + 4 Treaty"), 29 I.L.M. 1186 (1990)).

**11.** The Convention on the Settlement of Matters Arising out of the War and the Occupation, signed at Bonn on May 26, 1952, as Amended by Schedule 4 to the Protocol on the Termination of the Occupation Regime, signed at Paris on October 23, 1954, (the "Transition Agreement"), 332 U.H.T.S. 219.

**12.** The Agreement on German External Debts, February 27, 1953,(the "London Debt Agreement"), 4 U.S.T. 444.

the community of free nations, thus furthering overall European prosperity and strengthening the military forces standing in the way of Soviet expansion." *Burger–Fischer*, 65 F.Supp.2d at 268. External debts arising not only out of World War II but out of World War I and both post-war periods were re-structured to allow for a rebuilding of the German economy. In keeping with the Transition Agreement, claims for Nazi-era wrongs continued to be addressed by German restitution and compensation legislation, and the question of a final settlement of reparations was again deferred.

After the fall of the German Democratic Republic in 1989, a final multinational peace treaty with Germany became possible. The 2 + 4 Treaty, entered into on September 12, 1990, reunited Germany and restored to it full sovereignty over internal and external affairs. While reflecting a final settlement with the Allies, the 2 + 4 Treaty neither expressly provided for nor precluded additional reparations claims. Since the potential justiciability of claims for Nazi atrocities had ·seemingly been deferred by the Paris, Transition, and London Debt Agreements, the silence of the 2 + 4 Treaty on the issue resulted in a subsequent wave of litigation by former slave laborers.

As a practical matter, the claims of those injured by the Nazi government were first covered by military rules and regulations administered by the Allied armies which occupied Germany.[13] These military rules were replaced by laws of the German government, which were promulgated when the Transition Agreement shifted the burden of implementation to Germany. *See Burger–Fischer*, 65 F.Supp.2d at 267–68; *Iwanowa*, 67 F.Supp.2d at 452. The Foundation is in keeping with this long-standing policy of entrusting restitution and reparations mechanisms to the German people.

While the United States can by treaty address, and even extinguish, claims arising out of war-time conduct, *see Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 230, 1 L.Ed. 568 (1796), it is unquestioned that prior to the enactment of the Foundation, none of the post-war treaties *expressly* addressed or extinguished the claims of slave laborers. Plaintiff argues that since his claims were never expressly addressed by treaty, they do not touch on the political question doctrine, and should be treated as typical tort claims brought by an individual against a private company. Frumkin further contends that his claims are legally and qualitatively different from the claims which were addressed by the reparations agreements entered into after World War II, as his claims hinge on the conduct of individual defendants, versus the conduct of the Nazi government. While Plaintiff may be correct in distinguishing his claims from all those claims that have been heretofore expressly addressed, the creation of the Foundation now leaves Plaintiff grasping at an irrelevant distinction.

The opinions in *Burger–Fischer, Iwanowa*, and *Joseph Tiber Deutsch, et al. v. Turner Corp., et al.*, CV 00–4405 SVW (C.D.Cal. Aug. 28, 2000)(unpublished six-page slip opinion, dismissing slave labor case after adopting conclusions of *Burger–Fischer* and *Iwanowa* ), all concluded that dismissal of cases similar to Frumkin's was mandated by the political question doctrine, despite the failure of any treaty to expressly provide for the claims of slave laborers. 65 F.Supp.2d at 285, 67 F.Supp.2d at 489; *Deutsch*, at 5–6. All three decisions determined that the post-war claims settlement regime had been exclusively constructed by the political branches, and that it was not the place of

---

**13.** *See, e.g.,* Military Law No. 59 on Restitution of Identifiable Property of November 1947; Military Law to Provide Compensation for the Crimes Committed by the National Socialists of April 1949. Attached to Decl. of Dr. Peter Laars, submitted as Exh. 25 to the Cert. of John J. Gibbons in Support of Motion of All Defendants to Dismiss.

courts to resolve claims of the type brought by Frumkin.

Both Judge Greenaway in *Iwanowa* and Judge Debevoise in *Burger–Fischer* presented intricate, elaborate explanations of the history of post-war claims settlement, and demonstrated that the claims of individual plaintiffs against private German defendants were no longer properly justiciable in American courts. *See Burger–Fischer,* 65 F.Supp.2d at 284–85; *Iwanowa,* 67 F.Supp.2d at 483–89.

In the months after these opinions were issued, scholarly works were published that criticized the decisions, and argued that contrary to both courts' conclusions, the claims of slave laborers against companies were never intended to be addressed on a governmental level.[14] Such criticism, and any lingering doubts about whether Nazi-era slave labor claims may be resolved in the courts of the United States, have now been quieted by the creation of the Foundation.

Echoing the aforementioned scholars, Plaintiff contends that since none of the post-war treaties expressly addressed the claims of individuals against German companies, his claims have somehow been preserved and are ripe for litigation. Frumkin points to the Foundation as evidence of this fact, questioning why the Foundation would be created if the claims of slave laborers had previously been addressed by treaty. He further contends that the Foundation is not a treaty, and as such its implementation can not extinguish his legal rights.

Unfortunately, Plaintiff mischaracterizes the issue. The question is not whether Plaintiff's claims are barred by treaty, but whether his claims are such that they have been committed to the political branches for resolution. To find that they have not been would be to conclude that his claims

are somehow distinct from every other type of claim arising out of World War II, and that they have somehow been left open for judicial resolution. While the lack of express post-war recognition given slave labor claimants might have made this a contested question after the signing of the 2 + 4 Treaty, in light of the Executive Agreement to the Foundation, and the related Statement of Interest, it is now a question that has been definitively answered.

### 3. The Foundation

The negotiations which culminated in the creation of the Foundation began in Fall of 1998, when the German government asked Deputy Secretary of the Treasury Stuart E. Eizenstat to help facilitate a resolution of the numerous class action lawsuits pending in United States courts against German companies who utilized slave and forced labor, and committed other wrongs, during the Nazi era. Decl. of Stuart E. Eizenstat ¶ 5 (attached as Exh. 1 to the Statement of Interest of the United States ("Statement of Interest")).

Over the span of one-and-a-half years, Eizenstat co-chaired a series of formal and informal discussions among American plaintiff's lawyers, German companies, and the German government, on a "proposed initiative to establish a foundation to make payments to victims of slave and forced labor and all others who suffered at the hands of German companies during the Nazi era." *Id.* at ¶ 5. Also participating in these discussions were the State of Israel, the governments of Belarus, the Czech Republic, Poland, Russia, and Ukraine, and the Conference on Jewish Material Claims Against Germany, which is an umbrella organization representing numerous international Jewish nongovernmental organizations. *Id.* at ¶ 6.

---

**14.** *See, e.g.,* Jessica Amanda Burdick, Note, *Burger–Fischer v. DeGussa AG, "[T]he Greatest Robbery in the History of Mankind:" Holocaust Victims Once Again Victimized, This Time by the American Courts,* 16 T.M. Cooley L.Rev. 449 (1999); Michael J. Bazyler, *Nuremberg in America: Litigating the Holocaust in United States Courts,* 34 U. Rich. L.Rev. 1 (2000).

The quasi-formal initiative which had been ongoing since February, 1998, was publicly announced by German Chancellor Gerhard Schroeder, as well as a group of German companies, on February 16, 1999. Eizenstat Decl. ¶ 7. After the public announcement, twelve formal conferences chaired by representatives of the United States and German governments were held to discuss the initiative. *Id.* As a result of these conferences, and following the personal involvement of United States President Clinton and German Chancellor Schroeder,[15] in December, 1999, it was agreed that a foundation would be established, in exchange for which the claims pending against German defendants would be dismissed. *Id.* at ¶ 8.

In July, 2000 the German Parliament passed a law creating the Foundation "Remembrance, Responsibility and the Future," which closely embodied the detailed agreements reached by the parties to the negotiations. Eizenstat Decl. ¶ 11. The parties gathered in Berlin on July 17, 2000, to sign a Joint Statement concluding the negotiations, and expressing their support for the Foundation. *Id.* at ¶ 12. The governments of the United States of America and the Federal Republic of Germany simultaneously signed an Executive Agreement, which memorialized the specific commitments of the two governments to the Foundation. *Id.*

The law which created the Foundation as a legal entity[16] was promulgated in Germany on August 12, 2000. Eizenstat Decl. ¶ 13. On October 19, 2000, the United States and German governments exchanged diplomatic notes,[17] which brought the Executive Agreement into effect. *Id.*

As established under the Foundation Law, the Foundation will make payments to individual Nazi-era victims for claims against German Industry. *Id.* at ¶ 15; Foundation Law § 1(1). These payments will come out of a total fund with an initial capitalization of DM 10 Billion.[18] *Id.* at ¶ 16; Foundation Law § 3(2). This money shall be contributed in equal shares by the German government and German Industry. *Id.*

Those who suffered at the hands of German Industry during the Nazi era, including those who worked as slave or forced laborers for the Nazi regime, were subjected to medical experimentation, were held in a "kinderheim" (children's home), had property "aryanized", stolen, or damaged, or whose insurance policies went unpaid will be eligible to recover. Eizenstat Decl. ¶¶ 15–17. Eligible claimants are either those who personally were victims, or the heirs of victims who died after February 16, 1999. *See* Foundation Law § 13.

Each type of victim is entitled to a different rate of recovery under the Foundation Law. Each former slave laborer[19] will recover up to DM 15,000, and each former forced laborer[20] will recover up to DM 5,000. Eizenstat Decl. ¶ 16. Total payments to these two groups will exceed DM 8 Billion. *Id.; See* Foundation Law § 9. All victims, not merely those currently named as plaintiffs in legal actions, may apply for recovery from the Foundation.

15. *See* Letter from President William Clinton to German Chancellor Gerhard Schroeder (Undated)("Clinton Letter"), Attached as Exh. 3 to the Statement of Interest.

16. *Gesetz Zur Errichtung Einer Stiftung "Erinnerung; Verantwortung und Zukunft."* Translated as "Law on the Creation of a Foundation "Remembrance, Responsibility and Future" " (*cited as* "Foundation Law"). All subsequent references to the Foundation Law in this opinion are to the English language translation, Attached as Exh. 2 to the Statement of Interest.

17. Attached as Exh. C to the Statement of Interest.

18. Approximately $ 4.3 Billion.

19. Slave laborers are those who were intended to be literally worked to death. Eizenstat Decl. ¶ 16.

20. Forced laborers are those who were compelled to work against their will, but in somewhat less harsh conditions than slave laborers. Eizenstat Decl. ¶ 16.

Eizenstat Decl. ¶ 20. The application process itself will be short, simple, non-bureaucratic, non-adversarial, and will not require legal representation. Eizenstat Decl. ¶ 25. Determinations of eligibility are to be made on relaxed standards of proof, and a free appeals process will be available. *Id.;* Foundation Law § 19.

Given the advanced age of the victims, the primary humanitarian objective of the Foundation is to show results as soon as possible. Joint Statement, ¶ 2. For this reason, the Foundation has mechanisms allowing for expedited payments. Eizenstat Decl. ¶ 19. It is the goal of the Foundation to begin payments to slave and forced labor victims as soon as all those cases pending in the United States have been dismissed with prejudice. *See* Statement of Interest, Exh. A.

In addition to the payments to victims, Foundation Law § 2(2) designates DM 700 million for a "Future Fund", which is designed to promote tolerance and Holocaust awareness, and to support projects that benefit the heirs of those forced and slave laborers who did not survive. Eizenstat Decl. ¶ 19.

Unlike typical international agreements, the Agreement between the governments of the Federal Republic of Germany and the United States of America concerning the Foundation "Remembrance, Responsibility and the Future" is not a government-to-government claims settlement agreement. Eizenstat Decl. ¶ 14. Rather than extinguishing the legal claims of its nationals or anyone else, the United States merely helped facilitate an agreement between victims, German Industry, and the German government. *Id.* By acting in this manner, the United States' goal was to "bring expeditious justice to the widest possible population of survivors, and to help facilitate legal peace." *Id.*

In keeping with this, the Executive Agreement provides that the United States will, via the filing of a Statement of Interest in each pending cases, "advise U.S. courts of its foreign policy interests ... in the Foundation being treated as the exclusive remedy for World War II and Nazi era claims against German companies, and concomitantly, in current and future litigation being dismissed." *Id.; See* Executive Agreement, Art. 2 & Annex B.

In accordance with the Executive Agreement, the United States has filed with this Court a Statement of Interest with attachments, designed to articulate both the government's "foreign policy interests with regard to the German Foundation 'Remembrance, Responsibility and the Future'..., and the public interest in the cooperative resolution of claims for restitution and compensation arising out of the Holocaust." Statement of Interest, at 1–2. While the Statement of Interest is non-binding on the Court, the government "recommends dismissal on any valid legal ground." *Id.* at p. 2.[21] Specifically, the United States government believes that:

> [A]ll claims against German companies arising from their involvement in the Nazi era, including but not limited to claims relating to slave and/or forced labor, aryanization, medical experimentation, placement in children's homes, other cases of personal injury, and damage to or loss of property, including banking assets and insurance policies, should be pursued through the Foundation instead of the courts.

Eizenstat Decl. ¶ 28.

The position of the United States government recommending dismissal is motivated by the twin concerns of justice and urgency: matters of Holocaust-era restitution are best resolved through dialogue, negotiation, and cooperation as opposed to prolonged and uncertain litigation; and this provides some measure of justice and

---

**21.** The Statement of Interest does not address the merits of any legal claims before the Court. The Statement of Interest merely ar- gues for dismissal on "any valid legal ground." *See* Statement of Interest, at 21–22.

compensation to aged victims in their lifetimes. *See* Statement of Interest, at 2; Eizenstat Decl. ¶¶ 3, 29.

The Statement of Interest notes that the Foundation exemplifies the successful implementation of policies that the government favors, because it is the result of the parties, governments, and non-governmental organizations together reaching a plan for restitution and compensation through dialogue, negotiation, and cooperation. Statement of Interest, at 3. As President Clinton indicated, both the United States and German governments "believe in the historical and moral significance of bringing a sense of justice to former slave and forced laborers and others who suffered at the hands of German banks, insurance companies, and other German companies during the Nazi era. We can help restore a measure of human dignity to those who suffered and survived." Clinton Letter, at 2.

According to the government, the "creation and successful operation of the Foundation is in the enduring and high interests of the United States," Eizenstat Decl. ¶ 28, for a number of reasons. Notably, it may allow for "some measure of justice to Holocaust survivors and other victims of the Nazi era, who are elderly and are dying at an accelerated rate, in their lifetimes." *Id.* at ¶ 29. The Foundation will, "without question, provide benefits to more victims, and will do so faster and with less uncertainty than would litigation, with its attendant delays and legal hurdles." *Id.* at ¶ 30. It will also benefit all who have been injured by German Industry, not merely those who have been injured by the few surviving elements of German Industry that are within the limited reach of the courts of the United States. *Id.*

It is the opinion of the United States that the alternative to the Foundation "would be years of litigation whose outcome would be uncertain at best, and which would last beyond the expected life span of the large majority" of victims. Eizenstat Decl. ¶ 36. As dismissal of *all* the pending lawsuits is also requisite to *any* payment being made by the Foundation, the United States supports such dismissal as soon as possible, so that Germany may have legal peace, and the victims may have recovery. *Id.* (emphasis added).

Fifty-five years after the end of World War II, nearly $100 billion in current dollars has already been paid by way of reparations to the victims of Nazi atrocities. *Id.* The Foundation adds another $4.3 billion, which for the first time includes the significant contributions of the German private sector. *Id.*

### 4. The Foundation's Impact on Frumkin's Claims

The Foundation is not a reparations treaty, and it does not have direct preclusive effect on the litigation of Plaintiff's claims. *See Gerling Global Reinsurance Corp. of America v. Low,* 240 F.3d 739, 751 (9th Cir.2001). Nor is it a government-to-government claims settlement agreement.[22] Instead, it is a claims mechanism, established under German law with the input of the United States, which the United States has pledged to fully support via the Executive Agreement. It is also an expression of our government's longstanding commitment to the extra-judicial resolution of claims arising out of Nazi-era atrocities.

While the Foundation is not properly a "settlement" in the legal sense, German Industry and the German government have insisted on the dismissal of all pending litigation in the United States, as a

22. "The Executive Agreement negotiated is not a government-to-government claims settlement agreement, and the United States has *not extinguished the claims of its nationals or* anyone else. Instead, the intent of the United States' participation was to bring together the victims' constituencies on the one side and the German government and companies on the other to bring expeditious justice to the widest possible population of survivors, and to help facilitate legal closure." Statement of Interest, p. 7 (citations omitted).

pre-condition to allowing the Foundation to make payments to victims. Eizenstat Decl. ¶ 37. Neither the Executive Agreement nor the Statement of Interest *per se* provide an independent legal basis for achieving the requisite dismissals, but they do provide the Court with a clear expression of the will of the Executive branch in the realm of foreign affairs. The Executive Agreement provides that,

> [t]he United States shall ... inform its courts through a Statement of Interest ... that it would be in the foreign policy interests of the United States for the Foundation to be the *exclusive remedy and forum* for resolving ... claims asserted against German companies ... and that *dismissal of such cases would be in its foreign policy interest.*

Executive Agreement, 2(1) (emphasis added). That foreign policy interest was captured in the Statement of Interest subsequently filed in this case:

> The President of the United States has concluded that it would be in the foreign policy interests of the United States for the Foundation to be the exclusive forum and remedy for the resolution of *all asserted claims* against German companies arising from their involvement in the Nazi era and World War II ... Accordingly, the United States believes that all asserted claims should be pursued through the Foundation instead of the courts.

Statement of Interest, at 14, 15 (emphasis added). Additionally,

> The United States strongly supports the creation of the Foundation, and wants its benefits to reach victims as soon as possible. Therefore, in the context of the Foundation, it is in the enduring and high interest of the United States to vindicate that forum by supporting efforts to achieve dismissal of (i.e., "legal

peace" for) all Nazi era and World War II claims against German companies.

Statement of Interest, at 20.

The Executive Agreement and Statement of Interest leave no question that the Executive branch has determined that these claims should not be resolved in the courts of the United States, but instead should be submitted to the Foundation, which the government wishes to have function as the exclusive remedy for such claims. Having made that desire clear, rather than extinguish the claims pending in this Court by treaty or executive order, the government leaves it to the Court to dismiss the claims "on any valid legal ground." [23]

While the policy interests articulated in the Statement of Interest do not in and of themselves provide an independent legal basis for dismissal, the long-standing foreign policy commitment to resolving claims arising out of World War II and the Holocaust at a governmental level does provide such a basis. If the Court were to allow this action to continue, it would run afoul of the political question doctrine as articulated in *Baker*, 369 U.S. at 217, 82 S.Ct. 691.

Without addressing all six *Baker* factors, prominent on the surface of this case are the fourth factor and the sixth factor, namely the impossibility of this Court's undertaking independent resolution without expressing lack of respect due coordinate branches of government, and the potentiality of embarrassment to our country from multifarious pronouncements by various departments on one question. 369 U.S. at 217, 82 S.Ct. 691.

Regarding the fourth factor, the political branches of our government have labored with Germany for more than fifty-five years to fashion appropriate remedies for the victims of World War II, as evidenced

---

**23.** "The United States does not suggest that these policy interests described above in themselves provide an independent legal basis for dismissal." Statement of Interest, at 21. "Because of the United States' strong inter-

ests in the success of the Foundation, however, and because such success is predicated on the dismissal of this litigation, the United States recommends dismissal on any valid legal ground." *Id.*, at 21–22.

by numerous treaties and agreements. *See Burger–Fischer*, 65 F.Supp.2d at 265–72; *Iwanowa*, 67 F.Supp.2d at 447–56. The Foundation is yet another expression of that labor. Clearly the Executive branch intends the Foundation to be the exclusive remedy for all claims brought against German Industry. This includes claims for wrongful death, even though no individual payments will be made by the Foundation for such claims. A policy determination was made that the Foundation's Future Fund should be created to benefit heirs as a group, rather than diluting the finite Foundation assets via individual payments to countless heirs. Such a determination of how to apportion limited assets for use as reparations is classically a determination for the political branches, and not one the Court should trifle with.

If this Court were to allow Mr. Frumkin's claims to proceed to trial, it would unacceptably intrude into the foreign policy determinations of our government. Such a decision would in effect say that the Foundation and all of the treaties that have gone before are inadequate, and that this Court could somehow do better job of fashioning relief for victims of the Nazi era. *Burger–Fischer*, 65 F.Supp.2d at 284 (For a court to structure a reparations scheme would express ultimate lack of respect for executive).

As to the sixth factor, the potential for embarrassment to the United States grows larger with each day that cases such as Plaintiff's remain active in our nation's courts. The Executive Agreement is a pronouncement by our government that claims against German Industry should not be litigated, but instead should be submitted to the Foundation. That commitment, made in an international agreement, has been relied on by both the German government and German Industry in providing more than $4 Billion to the Foundation, which they reasonably expect will be the only vehicle for providing compensation to victims. That pronouncement has also been relied on by many victims around the world, who have already consented to dismissal of their actions in this Court and others.

If this Court were to do anything but dismiss Plaintiff's action, it would reach a conclusion that is directly in conflict with a pronouncement made by the Executive branch. Such a conclusion would undermine not only the political branches in the realm of foreign affairs, but undermine the Foundation itself; that such harm be avoided by dismissing Frumkin's action is squarely in keeping with *Baker*.

The foreign relations conflicts that would result from further litigation of this action are quite real. The Court can only imagine the distrust the German people would have for the United States if, as a result of this Court's actions, and contrary to the statements of our former President, the Foundation did not enter into effect. The Court is reminded that

the very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

*Atlee*, 347 F.Supp. at 697, *quoting Chicago & Southern Air Lines v. Waterman S S Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948). If this Court were to decline to dismiss Plaintiff Frumkin's action, it would impermissibly intrude into an area that has been exclusively managed by the Executive and Legislative branches for the last fifty-five years. Noting the very real harm to our foreign relations that could result from such an intrusion, this

Court must hold Plaintiff's claims to be non-justiciable, and dismiss them on those grounds.

## B. Frumkin's Takings Argument

■ Plaintiff argues that the Foundation is inapplicable to his action, since it does not provide for wrongful death claims, and that as a result his case should not be dismissed. (Opposition Brief, p. 5). Plaintiff further contends that dismissing his action constitutes the unlawful taking of a property interest by the United States government, in violation of the Fifth Amendment to the Constitution, because the government has provided no adequate mechanism to resolve his legal claims. (Opposition Brief, p. 6).

According to Frumkin, "no government, especially the United States, has the right to extinguish plaintiff's claims." (Opposition Brief, p. 1). This statement is inconsistent with the history of war reparations, not just after World War II, but after virtually every conflict in our nation's history. While neither the Executive Agreement nor any other element of the Foundation serve to extinguish the rights of plaintiffs in the courts of the United States, had the government issued an executive order along with the Executive Agreement, it could legally have ordered the dismissal of Plaintiff's claims in favor of the Foundation. *See Dames & Moore,* 453 U.S. at 679, 101 S.Ct. 2972; *Belk,* 858 F.2d at 709.

Even assuming the Foundation somehow extinguished this action, given the claims provisions of the Foundation Plaintiff would not have a cognizable takings claim for a number of reasons. Plaintiff's assertion rests on the theory that unless the United States provides an adequate alternate forum for his extinguished claims, it has committed an unlawful taking. (Opposition Brief, p. 4). Plaintiff contends that the Foundation does not constitute an adequate alternative forum, because the payments for slave labor claims are insufficient, and because pay-

ment for wrongful death claims is not made at all. Plaintiff states that "[i]f the Defendants want to end this claim, then let the Defendants provide an appropriate settlement in this case." (Opposition Brief, p. 4).

In support of this argument, Plaintiff points to *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), contending that the President may not destroy Plaintiff's property rights without establishing an alternative forum for resolution of Plaintiff's claims. (Opposition Brief, p. 45). *Dames & Moore* is distinguishable from this matter. In that case, to secure the release of hostages from the American Embassy in Tehran, Presidents Carter and Reagan, via Executive Order, expressly extinguished the pending and future legal claims of individuals against Iran and Iranian companies as part of a settlement, in favor of an international arbitration mechanism. 453 U.S. at 666, 101 S.Ct. 2972.

The most important aspect of the *Dames & Moore* decision was the "conclusion that Congress has implicitly approved the practice of claim settlement by executive agreement," which permitted the waiver of the pending claims against Iran without Congressional advice, consent, or ratification. 453 U.S. at 680, 101 S.Ct. 2972. The Supreme Court found additional support for dismissal in the fact that the executive agreement provided an alternative forum, which was capable of providing meaningful relief. 453 U.S. at 687, 101 S.Ct. 2972.

Plaintiff's takings argument hinges on an ancillary portion of the *Dames & Moore* decision, in which the Court noted in passing that the suspension of claims by the Executive branch, absent just compensation, might constitute a taking of property in violation of the Fifth Amendment to the United States Constitution. 453 U.S. at 688, 101 S.Ct. 2972. While the takings issue was found to be unripe, the Court held that to the extent petitioners believed they had suffered a taking, they should be

able to bring a claim in the United States Court of Claims under the Tucker Act, 28 U.S.C. § 1491. *Id.*, at 689–90, 101 S.Ct. 2972.

Just such a takings claim was addressed by the Court of Appeals for the Federal Circuit in *Belk v. United States*, 858 F.2d 706 (Fed.Cir.1988). The *Belk* court affirmed the ruling of the Claims Court, which dismissed the complaint on the grounds that 1) the government's action did not constitute a taking, and 2) prosecution of the complaint would require the resolution of political questions. 858 F.2d at 707, *citing Belk v. United States*, 12 Cl.Ct. 732 (1987).

According to the Federal Circuit, where the President's actions were primarily designed to benefit those who were asserting claims, those actions did not constitute a taking. *Belk*, 858 F.2d at 709. The mere fact that the President might have somehow obtained better terms did not render the action a taking. *Id.*, at 710. Further, the issue of what terms might be adequate presented a non-justiciable question, as "a judicial inquiry into whether the President could have extracted a more favorable settlement would seriously interfere with the President's ability to conduct foreign relations." *Id.* at 710; *cf. United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936).

As noted, *Dames & Moore* is distinct from this case in that Frumkin's claims have not been expressly extinguished by act of the Executive branch, but even if they had been, the alternate claims mechanism that the Foundation represents would certainly bar a takings claim, given the *Belk* decision. The Executive branch has made the foreign policy determination that the claims of former slave laborers should not be resolved in the Courts of the United States, but instead should be presented to the Foundation; a forum that, like the arbitration tribunal in *Dames & Moore*, "removes a number of jurisdictional and procedural impediments faced by claimants in the United States courts." 453 U.S. at 687, 101 S.Ct. 2972.

Given the holdings in *Dames & Moore* and *Belk*, it would be incorrect to find that Plaintiff's legal claims had been impermissibly bargained away without just compensation. *See also Can v. United States*, 14 F.3d 160, 163 (2nd Cir.1994)(President may properly use private claims as bargaining chips); *Japanese Forced Labor Lit.*, 114 F.Supp.2d at 948–49 ("while full compensation for plaintiffs' hardships, in the purely economic sense, has been denied ... the immeasurable bounty of life for themselves and their posterity in a free society and in a more peaceful world services the debt"). Instead, Plaintiff's claims (to the extent that they were ever justiciable, and not barred on other grounds) would have been traded for access to an international foundation before which recovery is more likely than in the courts. As the Court is unaware of any decision in a United States court where a Plaintiff has successfully recovered for claims stemming from slave labor or similar injuries,[24] the mere creation of a foundation that provides for direct recovery on some of Plaintiff's claims (regardless of how modest), is an act with its own inherent value.[25] Similarly, the Foundation also

---

24. *See, e.g., Kelberine v. Societe Internationale*, 363 F.2d 989 (D.C.Cir.1965); *Princz·v. Federal Republic of Germany*, 26 F.3d 1166 (D.C.Cir.1994); *Burger–Fischer v. DeGussa, et. al.*, 65 F.Supp.2d 248 (D.N.J.1999); *Iwanowa v. Ford Motor Co.*, 67 F.Supp.2d 424 (D.N.J. 1999); *Sampson v. Federal Republic of Germany*, 975 F.Supp. 1108 (N.D.Ill.1997); *Handel v. Artukovic*, 601 F.Supp. 1421 (C.D.Cal. 1985); *Kalmich v. Bruno*, 450 F.Supp. 227 (N.D.Ill.1978); *Fischel v. BASF Group*, 1998 U.S. Dist. LEXIS 21230(D. Iowa March 11, 1998); *Josef Tiber Deutsch, et al. v. Turner Corp., et al.*, CV 00–4405 SVW (C.D.Cal. August 28, 2000)(Wilson, J.); *Friedman v. Bayer Corp.*, Civ No. 99 CV 3615 slip op. (E.D.N.Y. Dec. 15, 1999)(Sifton, C.J.).

25. "The fact that the President has provided [an arbitration panel] means that the claimants are receiving something in return for the suspension of their claims, namely, access to an international tribunal before which they may well recover something on their claims."

represents acceptance of moral accountability by German Industry. This acceptance of responsibility was sought by a number of plaintiffs, and may have its own independent remedial value.

While no compensation is directly provided to heirs for wrongful death claims, § 2(2) of the Foundation Law designates DM 700 million for a Future Fund, which is designed to promote tolerance and Holocaust awareness, and to support projects that benefit the heirs of those forced and slave laborers who did not survive. Eizenstat Decl. ¶ 19. Since a policy determination was made that the creation of programs to benefit all heirs indirectly would be more beneficial than dividing available funds across countless heirs worldwide, it can not be said Plaintiff will receive nothing for his wrongful death claim.

That Plaintiff feels the compensation provided by the Foundation is inadequate does not change the fact that the Foundation is just the sort of alternative forum which the *Dames & Moore* Court looked favorably upon. The core of Plaintiff's takings claim is not that his claim is to be dismissed, but that he is not going to be paid enough by the Foundation in exchange for that dismissal. It must be noted that this criticism goes not just to the adequacy of the Foundation, but to the adequacy of the entire fifty-five-year history of reparations. Were the Court to attempt resolution of this adequacy question, it would invariably run afoul of *Baker*, as previously discussed.

Plaintiff's last contention is that a ruling by the Court declining to exercise jurisdiction would leave him with no alternative remedy. This is simply not the case. First, quite obviously, Plaintiff may pursue a claim under the German Foundation Law. Additionally, in cases where courts decline to exercise jurisdiction in the face of a political question, the Constitution "contemplates an additional remedy for plaintiffs: Congress." *Atlee*, 347 F.Supp. at 708; *Can*, 14 F.3d at 165. If Plaintiff is dissatisfied with the creation of the Future Fund as compensation for his wrongful death claims, he should request that his representatives in the legislature attempt to fashion a more appropriate remedy.

■ Given the foregoing, Plaintiff's mere belief that he might received additional compensation for his claims in court, as opposed to before the Foundation, does not constitute a taking. If he feels the Foundation is somehow inadequate, Plaintiff may contact his representatives in Congress, who could propose legislation either supplementing the Foundation, or expressly creating a federal right of action to recover for slave labor claims.[26]

### C. International Comity

■ The Court's decision to dismiss this case given the implementation of the Foundation is in keeping with the principles of international comity. International comity is "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 143, 16 S.Ct. 139, 40 L.Ed. 95 (1895). Similar to the political question doctrine, which is "a tool for maintenance of governmental order," *Baker*, 369 U.S. at 215, 82 S.Ct. 691, international comity "is not a rule of law, but one of practice, convenience, and expediency." *Remington Rand Corp. v. Busi-*

*Dames & Moore*, 453 U.S. at 687, 101 S.Ct. 2972.

**26.** California, on the other hand, may not constitutionally create a right of action that circumvents Executive reparations policy, as matters of foreign affairs are expressly delegated to the federal government, not the states. "[S]tate law must yield when it is inconsistent with or impairs the policy or provisions of a treaty or of an international compact or agreement." *U.S. v. Pink*, 315 U.S. 203, 230–31, 62 S.Ct. 552, 86 L.Ed. 796 (1942).

*ness Systems, Inc.,* 830 F.2d 1260, 1267 (3d Cir.1987), *quoting Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 440 (3d Cir.1971) (*cert. denied,* 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972))

The doctrine is still alive and well, and is of increasing importance in today's world of global transactions and multi-national corporations. The Third Circuit has repeatedly supported the principle, holding that American courts normally give effect to the executive, legislative and judicial acts of foreign nations, and that domestic courts should withhold comity only when its acceptance would be contrary or prejudicial to the interest of the United States. *Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A.,* 44 F.3d 187, 191 (3d Cir.1994), *citing Remington Rand,* 830 F.2d at 1266, and *Somportex,* 453 F.2d. at 440.

■ The Court has been asked by Defendants to dismiss Frumkin's action to give effect to the validly enacted German Foundation Law. Plaintiff opposes this, and has asked the Court to deny dismissal on the grounds that the Foundation is inadequate. The conflicting requests of the parties present two distinct comity issues. The first issue is whether the Court should defer judgment in this case, to lend effect to the laws of a foreign state. The second issue is whether the Court may challenge the validity of the German Foundation Law itself.

Regarding the first issue, a district court must generally make appropriate findings as to whether giving effect to a foreign judicial act would be prejudicial to the interests of the United States, and exercise its discretion in determining whether it will recognize foreign proceedings based on those findings. *Philadelphia Gear,* 44 F.3d at 191.

The Court's task of determining whether dismissal would result in prejudice is simplified by the Statement of Interest that has been filed by the United States. The government has plainly demonstrated to the Court that not giving effect to a foreign judicial act (in this case the German Foundation Law) would be prejudicial to the overriding foreign policy interests of the United States, and accordingly should be avoided.

Additionally, a court must evaluate whether a true conflict exists between the law of the United States and that of a foreign jurisdiction. *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 798, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993). What is required to establish a true conflict is an allegation that compliance with the laws of both countries would be impossible. *See In re Maxwell Communication Corp.,* 93 F.3d 1036, 1050 (2nd Cir.1996). In this case, the Foundation, which is a validly enacted sovereign instrumentality of the Federal Republic of Germany, will only function if all pending litigation in the United States ceases. This Court can envision no clearer conflict of law.

Regarding the second issue, whether the Court can challenge the validity of the German Foundation Law, United States courts ordinarily refuse to review acts of foreign governments, and instead defer to proceedings taking place in foreign countries, allowing those acts and proceedings to have extraterritorial effect in the United States. *Pravin Banker Assoc., Ltd., v. Banco Popular Del Peru,* 109 F.3d 850, 854 (2d Cir.1997).

Comity forces courts in the United States to tailor their remedies carefully to avoid undue interference with the domestic activities of other sovereign nations. *Republic of the Philippines v. Westinghouse Electric Corp.,* 43 F.3d 65, 75 (3d Cir.1994). International comity prohibits courts in the United States from examining the legitimacy of actions taken by another government in its territory. *Oetjen v. Central Leather Co.,* 246 U.S. 297, 303, 38 S.Ct. 309, 62 L.Ed. 726 (1918). "To permit the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the courts of another would very cer-

tainly 'imperil the amicable relations between governments and vex the peace of nations.'" *Id.* Additionally,

> "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves." *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897).

*Oetjen,* 246 U.S. at 303, 38 S.Ct. 309.

This Court is not in a position to question whether the payment structure under the German Foundation Law is either adequate or legal. Such a determination must be made by the courts of Germany, or alternatively some challenge might be made through diplomatic channels. Since the United States has spoken to the validity of the Foundation via its Statement of Interest, Plaintiff's last hope might have been some favorable ruling by the German legal system questioning the validity of the Foundation Law.

Unfortunately for Plaintiff, this Court has before it a ruling of the highest German Civil Court,[27] which definitively states that the Foundation is both constitutional and that it should be the exclusive remedy for slave labor claims.[28] In the case decided by the BGH, a former slave laborer challenged the applicability and legality of the Foundation. The BGH found that in accordance with § 16 of the Foundation Law, former slave laborers could only seek redress for their injuries from the Foundation, and that any further judicial claims in connection with Nazi injustices were barred by article 2 of the Foundation Law. Additionally, the BGH determined that there was no basis to challenge the consti-

tutionality of the Foundation Law, and that the Foundation complied with the German Constitution.

Our Executive branch has clearly articulated that it would be in the foreign policy interest of the United States for legal effect be given to the German Foundation Law. A clear conflict exists between that application of that law, and the continuation of legal proceedings in courts of the United States. The Court has before it the final decision of Germany's highest civil court that the Foundation Law is both constitutional and the exclusive remedy available under the German legal system for claims stemming from Nazi injustices. In light of these factors, it is the conclusion of the Court that dismissal of Plaintiff's action is not only mandated on justiciability grounds, but would be in keeping with the principles of international comity. Given the foregoing, the Court sees no alternative but to dismiss Plaintiff's case with prejudice.

## III. Conclusion

Neither the Executive Agreement nor the Statement of Interest filed by the government in this case provide an independent basis for dismissal of Plaintiffs' claims, in the way that a treaty, executive order, or federal statute would. Instead, the Executive Agreement and Statement of Interest vividly demonstrate that a commitment has been made by the Executive branch to resolve claims such as those brought by Frumkin politically, on an intergovernmental level. This is in keeping with almost six decades of treaties and agreements that have been orchestrated by the political branches of government, and committed to Germany for implementation.

It has been stated to the Court that it would be in the foreign policy interests of the United States for all claims against

---

**27.** For an overview of the German legal system, see *Iwanowa,* 67 F.Supp.2d at 434–437.

**28.** Nov. 30, 2000 Decision of the *Bundesgerichtshof* ("BGH")(German Federal Supreme Court)(III ZB 46/00), attached to the Decl. of Dr. Martin Hirsh, filed Jan. 23, 2001.

German defendants to be dismissed in favor of the German Foundation Law, which was negotiated in part by the Executive branch of the United States government. If this does not clearly demonstrate that the claims against German Industry presently before the Court constitute political questions best left to the political branches, it is unclear to the Court what would. Judges Debevoise and Greenaway in *Burger–Fischer* and *Iwanowa* each reached the conclusion that the similar claims which confronted them were non-justiciable based on the weight of history, given the continuum of compensation implemented since World War II. Noting that they reached this conclusion without benefit of a statement of interest to guide them, the ruling that this Court must now make in light of the Statement of Interest before it is even more clear.

The German Foundation does not form the basis for this dismissal; the political question doctrine and considerations of international comity do. The Statement of Interest lends support to the proposition that claims such as Frumkin's should be (and have always been) resolved by the political branches. If the Court were to allow this case to proceed to trial, it would be a declaration to the Executive branch that more than fifty years of treaties, agreements, and other foreign policy determinations, including the newly formed Foundation, are unacceptable or otherwise inadequate, and that by allowing this litigation to continue the Court could somehow provide a more appropriate remedy.

Unilaterally allowing an entire class of people to pursue judicial recovery for conduct that is inexorably linked to the atrocities of World War II would fly in the face of both political and legal convention. It is not the place of the legal system to determine whether treaties in a given area are adequate, or whether they ensure just recovery for all those who have been undeniably wronged. That power is reserved for the Executive branch, with the oversight of Congress.

It must be noted that but for Plaintiff's claims, and the claims brought in the other actions that have been dismissed voluntarily, the Foundation would not exist. As was aptly put by Plaintiff, until the lawsuits in the United States were filed, German Industry denied the slave laborers' claims for over half a century. Only the pressure of litigation brought about the Five Billion Deutschmark contribution of German Industry which now aims to provide a measure of moral accountability. While the $7,500 provided by the Foundation to any individual claimant seems minuscule against the backdrop of the horrors they once endured, the almost $4 Billion in total payments to be made by the Foundation is unprecedented.

If pure evil has ever existed, it was undeniably manifest in the conduct of the Nazi government and its corporate henchmen during the 1930s and 1940s. That compensating people for the harms wrought by National Socialism has remained an issue into the 21st century is clear testimony to that fact. No amount of money could ever restore life to the tens-of-millions whose lives were taken, or compensate the millions of survivors whose lives were destroyed. This Court must dismiss Plaintiff's claims, but not because he is undeserving of relief. This Court must dismiss Plaintiff's claims because the magnitude of World War II has placed claims such as his beyond the province of this Court, and into the political realm.

An appropriate order follows.

## ORDER

This matter having come before the Court on the motion of Defendant J.A. Jones, Inc. to dismiss pursuant to Fed. R.Civ.P. 12(b); and

The Court having considered the submissions of the parties; and

The Court having heard oral argument; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

IT IS on this 1st day of March, 2001, hereby ORDERED that Defendant's motion to dismiss is **granted,** and Plaintiff's complaint is **dismissed with prejudice;**

IT IS FURTHER ORDERED that the Clerk of the Court shall **close** this case.