320 F.Supp.2d 235 (2004)
In re NAZI ERA CASES AGAINST GERMAN DEFENDANTS LITIGATION.
Elly Gross, et al., Plaintiffs,
v.
The German Foundation Industrial Initiative, et al., Defendants.
Barbara Schwartz Lee and Bernard Lee, Plaintiffs,
v.
Deutsche Bank, AG, & Dresdner Bank, AG, Defendants.
Nos. CIV.02-2936(WGB), CIV.03-3181(WGB).
United States District Court, D. New Jersey.
June 8, 2004.
*236 Allyn Z. Lite, Esq., Lite, DePalma, Greenberg & Rivas, LLC, Newark, NJ, Michael D. Hausfeld, Esq., Agnieszka M. Fryszman, Esq., Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, Burt Neuborne, Esq., Michelle Weitz, Esq., Deborah Sturman, Esq., Bernstein Litowitz Berger & Grossman, New York, NY, Lisa J. Rodriguez, Esq., Haddonfield, NJ, for Plaintiffs.
John J. Gibbons, Esq., Thomas R. Valen, Esq., Gibbons, Del Deo, Dolan, Griffinger & Veccione, PC, Newark, NJ, Terry Myers, Esq., Gibbons, Del Deo, Dolan, Griffinger & Veccione, New York, NY, Kevin J. McKenna, Esq., Gibbons, Del Deo, Dolan, Griffinger & Veccione, Newark, NJ, Brian E. McGunigle, Esq., Coudert Brothers LLP, New York, NY, Daniel Gsovski, Esq., Hersfeld & Rubin, P.C., New York, NY, Jeffrey L. Chase, Esq., Chase, Kurshan, Herzfeld & Rubin, LLC, Livingston, NJ, Bud G. Holman, Esq., Kelley, Drye & Warren, New York, NY, Christopher Landau, Esq., Brant W. Bishop, Esq., Susan Kearns, Esq., Kirkland & Ellis LLP, Washington, D.C., Keith G. Von Glahn, Esq., Wilson, Elser, Moskowitz, Edelman & Dicker LLP, Newark, NJ, Thomas M. Mueller, Esq., Michael O. Ware, Esq., Shannon L. Steege, Esq., Mayer, Brown, Rowe & Maw, LLP, New York, NY, Jeffrey Barist, Esq., Jeffrey L. *237 Nagel, Esq., Milbank, Tweed, Hadley & McCoy, LLP, New York, NY, Konrad L. Cailteux, Esq., Nina Nagler, Esq., Weil, Gotshal & Manges LLP, New York, NY, Rosemary J. Bruno, Esq., Klett, Rooney, Lierber & Schorling, P.C., Newark, NJ, Roger M. Witten, Esq., John A. Trenor, Esq., David W. Bowker, Esq., Anja, L. Manuel, Esq., Wilmer, Cutler, Pickering LLP, New York, NY, Joseph A. Boyle, Esq., Kelley, Drye & Warren LLP, Parsippany, NJ, for defendants.

OPINION
BASSLER, District Judge.
These actions arise from initial efforts made by Holocaust victims to obtain money judgments from German corporations ("German Industry") for their complicity in exploiting plaintiffs as slave laborers[1] during World War II. What remains here is a burgeoning dispute over certain terms to an agreement principally between counsel for Nazi-era victims, the German Government and German Industry, and facilitated by the United States, which in the dawning days of the twenty-first century appeared to tuck neatly to bed a giant dispute, fifty years in the making, concerning claims against German Industry in U.S. courts.
Since the end of World War II, Germany has paid "more than DM 100 billion in compensation to victims of Nazi persecution[.]"[2] Schwartz Lee Compl., Ex. 13 at 1 (Statement by Treasury Deputy Secretary Stuart Eizenstat to the German Bundestag on Feb. 16, 2000.) Additionally, in December 1999, attorneys for various plaintiffs, the German Government and German Industry orally agreed that various plaintiffs would dismiss their lawsuits against German Industry in exchange for the creation of the German Foundation "Remembrance, Responsibility and the Future" (the "Foundation"), which would be funded in the amount of DM 10 billion, half of the principal contribution to be made by German Industry. That oral arrangement was memorialized on July 17, 2000 in a joint statement signed in Berlin (the "Joint Statement")[3] and concurrently the Governments of the United States and Germany signed an executive agreement (the "Executive Agreement") that reflected the specific commitments of the two governments to the Foundation. A detailed history of these events can be found in this Court's opinions In re Nazi Era Cases Against German Defendants Litigation ("Nazi Era Cases"), 198 F.R.D. 429 (D.N.J.2000), and Frumkin v. J.A. Jones, 129 F.Supp.2d 370 (D.N.J.2001).
Ultimately, at issue here is whether mutually sufficient and timely interest payments have been made to the Foundation by German Industry. Elly Gross, Roman Neuberger, Sylvia Greenbaum, John Brand, Barbara Schwartz Lee and Bernard Lee (collectively, "Plaintiffs") argue that "unless action is taken to enforce the interest obligations contained in the Joint *238 Statement, the victims of Nazi persecution will suffer a shortfall of substantially more than DM 100 million in anticipated payments, rendering it impossible for the Foundation to fund adequately payments to certain categories of victims...." Neuborne Decl. ¶ 102. Presently, the named defendants  German Industry corporations and the German Foundation Industrial Initiative[4]  move to dismiss Plaintiffs' claims pursuant to Federal Rules of Civil Procedure Rule 12(b)(6), but argue principally in the alternative that Plaintiffs' claims are nonjusticiable, i.e., that the political question and act of state doctrines as well as principles of international comity necessitate dismissal. In addition, Defendants argue that Plaintiffs' complaints are barred by the doctrine of res judicata as well as Plaintiffs' inability to establish Article III standing. The Court will address these grounds in reverse order after its threshold review of subject matter jurisdiction and venue.
Before tackling these legal issues, however, the Court is compelled to acknowledge that the Foundation is well on its way to satisfy its founding two-part objective "to make financial compensation available ... to former forced laborers and to those affected by other injustices from the National Socialist period" and the establishment of a future fund to serve educational needs "[i]n commemoration and respect" of those victims as well as those who did not survive. Schwartz Lee Compl., Ex. 17 at 1. Deputy Secretary of State Richard L. Armitage acknowledged the first goal by writing: "I am pleased to learn that the Foundation's tremendous progress continues, and that $1.3 billion in payments have been made to some 750,000 surviving forced and slave laborers." Valen Decl., Ex. J at 2. In a letter to Secretary of State Colin L. Powell, the German Minister of Finance noted the Foundation's accomplishment in broader terms: "The [Foundation] stands as one of the proud achievements of German-American cooperation in recent decades. We have every political reason to defend this." Id., Ex. I at 1. More recently, Plaintiffs' counsel provided that the current disputes over interest "should not obscure the fundamental success of the [Foundation] in assembling and paying out over DM 5.5 billion to more than 1.5 million victims of Nazi persecution during its first two and one-half years of existence." Neuborne Decl. ¶ 21. With this estimable backdrop, the Court frames its analysis.

I. Original Jurisdiction & Venue

Plaintiffs allege that this Court has diversity, federal question and supplemental jurisdiction in this action. Diversity jurisdiction certainly exists. Plaintiffs Schwartz Lee and Lee are citizens of California and the named defendants in their complaint (the "Schwartz Lee Complaint") are German corporations. Similarly, plaintiffs Gross, Neuberger, Greenbaum and Brand are citizens of New York, New York, Florida and Texas, respectively, and the named defendants in their complaint (the "Gross Complaint") are German corporations. Further, the amount in controversy requirement is met in these civil actions. The disputed sum exceeds DM *239 100 million, well beyond the minimum amount in controversy requirement.
Federal question jurisdiction is not evident, however. No claim is made that invokes the Constitution, federal law or treaties to which the United States is a signatory. Instead, the Schwartz Lee and the Gross Complaints are founded explicitly on common law breach of contract and fraudulent misrepresentation claims. As for supplemental jurisdiction, both complaints fail to differentiate what, if any, claims fall beyond the ones that this Court may entertain pursuant to original jurisdiction based on diversity of citizenship.
Both the Schwartz Lee and Gross Complaints assert that venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a)(2) and 1391(d). It appears that § 1391(a)(2) is an adequate ground as venue is proper, in diversity jurisdiction actions, in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred[.]" 28 U.S.C. § 1391(a)(2). Plaintiffs argue that promises and misrepresentations  the underlying cause of the dispute here  were made before this Court as to the legal and financial responsibilities of German Industry. As such, venue is proper here.

II. Article III Standing

The United States Constitution's Article III "case and controversy" requirement necessitates that a party have standing to obtain judicial resolution of a dispute. Generally, for individual standing,
at an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," ... and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision...."
Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (citations omitted); see Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals Inc., 913 F.2d 64, 70 (3d Cir.1990). In Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Supreme Court expounded on this "irreducible constitutional minimum" requirement by articulating a three-part test for standing.
First, the plaintiff must have suffered an "injury in fact"  an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) "actual or imminent, not `conjectural' or `hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of  the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... the result [of] the independent action of some third party not before the court." Thirdly, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."
Lujan, 504 U.S. at 560-61, 112 S.Ct. 2130 (citations omitted).
These standing criteria emphasize "that a plaintiff's complaint must establish that he has a `personal stake' in the alleged dispute, and that the alleged injury suffered is particularized to him." Raines v. Byrd, 521 U.S. 811, 819, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (citing Lujan). Of the "justiciability doctrines" such as ripeness and political question, the Supreme Court stated that "[t]he Art. III doctrine that requires a litigant to have `standing' to invoke the power of a federal court is perhaps the most important of these doctrines." Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).
*240 The Plaintiffs' complaints demonstrate that they will suffer an "actual" and "imminent" injury-in-fact. Although Defendants challenge that any injury resulting from the interest dispute only injures the Foundation, see Defs.' Brf. in Supp. at 38, the Court is convinced that Plaintiffs will suffer an injury if their allegations concerning the Defendants' failure to adequately fund the Foundation are correct. For example, Dr. Schwartz Lee alleges that in 1941 she and her sister "were taken by the Germans and forced into slave labor." Schwartz Lee Compl. ¶ 11. Although she has received "a partial payment of $4,454.38 from the Claims Conference, the Partner Organization charged with distributing Foundation funds[,]" she is expecting an additional sum to come from a second round of payments. Id. According to Plaintiffs: "Unfortunately, a funding shortfall attributable to Defendants' refusal to pay the promised interest is delaying payment of the second tranche to [Plaintiffs] and to 138,000 other surviving Jewish slave laborers." Pls.' Brf. in Opp. at 47. Thus, Plaintiffs allege that monies owed to them from the Foundation will be both delayed and reduced as a result of the interest issues. The delay in distributing the second tranche of payments qualifies as an actual injury, whereas the reduced amount expected in the second tranche is an imminent injury. As such, Plaintiffs demonstrate adequately that the injury-in-fact requirement in the Lujan triad is met.
The second part of the Lujan test for standing requires that Plaintiffs show that there is "a causal connection between the injury and the conduct complained of[.]" The conduct complained of here is straightforward  Defendants allegedly have insufficiently funded the Foundation as a result of the withholding or conversion of interest payments in violation of oral and written representations to Plaintiffs. If that allegation is true, the injury identified above is causally related to the "shortfall" in Foundation funds.
Lastly, Plaintiffs must establish that their injuries can be redressed by a favorable decision. Defendants argue that "[n]othing in the complaints show that [1] the Foundation and the German Government would accept a decision of this Court and collect a debt they have determined to be non-existent ... [or 2] that [Plaintiffs] would receive any additional payment from the Foundation if the Defendants were to contribute additional amounts." Defs.' Brf. in Supp. at 39. These arguments notwithstanding, Plaintiffs need only show that "it is likely" that their alleged injuries "will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). At this point, the Court will not concern itself with how a decision on the merits, if justiciable, would be received by the Foundation, German Industry or the German Government. Both the Gross and Schwartz Lee Complaints name German Industry  corporations arguably within this Court's reach  as defendants, and not the Foundation, a sovereign instrumentality, and the Republic of Germany, a sovereign state, as defendants. Also, as explained above, because a causal connection exists between diminished Foundation funds and timely and sufficient payments to Plaintiffs, Plaintiffs established that additional interest amounts provided to the Foundation would effectively lead to additional sums, albeit small increases, provided to Plaintiffs.
The requirement of redressability for Article III standing does not mandate that the injury be definitively redressed here and is satisfied as long as redress may be available. However, the availability of judicial resolution should not be viewed in a vacuum. Although the Third Circuit has held that [s]tanding is established at the *241 pleading stage[,]" that court also stated that "[t]he redressability prong of the standing test is meant to ensure that the facts involved in a suit are conducive to judicial resolution and are likely to be resolved by court action." Anjelino v. New York Times Co., 200 F.3d 73, 88-89 (3d Cir.1999) (citing Lujan and Valley Forge, 454 U.S. at 472, 102 S.Ct. 752). Valley Forge established that "[t]he requirement of `actual injury redressable by the court' ... tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." Valley Forge, 454 U.S. at 472, 102 S.Ct. 752 (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 39, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)); see Versarge v. Township of Clinton, 984 F.2d 1359, 1368-69 (3d Cir.1993).
Looking ahead for a moment to another issue of justiciability, there is a credible position that the Court should refrain from addressing the merits of Plaintiffs' claims due to a nonjusticiable political question. That realization gives the Court pause here. The Court is reassured, nevertheless, that Plaintiffs do establish standing, and that their claims may be redressable at the pleading stage based on the Supreme Court's holding in Simon, a decision that was significantly precedential to its subsequent opinions in Valley Forge and Lujan. In fact, in Lujan's three-part test the Supreme Court cited directly to Simon, 426 U.S. at 38, 43, 96 S.Ct. 1917, when it held that "it must be `likely,' as opposed to merely `speculative,' that the injury will be `redressed by a favorable decision.'" Lujan, 504 U.S. at 561, 112 S.Ct. 2130.
In Simon, the Supreme Court distinguished standing from "other associated doctrines, for example, that which restrains federal courts from deciding political questions[.]" Simon, 426 U.S. at 37-38, 96 S.Ct. 1917. The Simon Court summarized that "when a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." Id. at 38, 96 S.Ct. 1917 (emphasis added). Here, "assuming justiciability" of Plaintiffs' claims, Plaintiffs have adequately demonstrated that they have standing to sue.

III. Bona Fide Dispute

Section 4(d) of the Joint Statement reads, in part:
[T]he DM 5 billion contribution of German companies shall be due and payable to the Foundation and payments from the Foundation shall begin once all lawsuits against German companies arising out of the Nationalist Socialist era and World War II pending in U.S. courts ... are finally dismissed with prejudice by the courts.
Schwartz Lee Compl., Ex. 15 at 5. Section 4(d) continues that the "German company funds will continue to be collected on a schedule and in a manner that will ensure that the interest earned thereon before and after their delivery to the Foundation will reach at least 100 million DM." Id.
It is Plaintiffs' understanding that section 4(d) reflects interest obligations that "anticipated a 6 month delay in the payment of DM 5 billion" in order to bring about the dismissal of the relevant U.S. cases. Neuborne Decl. ¶ 20. The provision of "at least 100 million DM" reflects, according to Plaintiffs, "interest at 4%"  the then prevailing German rate of interest  on the principal DM 5 billion for six months. Id. As such, the delay to dismiss the relevant cases due to "an unanticipated 6-10 additional months to the deferral period" *242 [5] resulted in additional interest beyond the minimum amount of DM 100 million. Id. ¶ 19.
The Gross and Schwartz Lee Complaints differ, however, on when the interest obligations began to accumulate. According to the Gross Complaint, the interest obligations began upon the signing of the Joint Statement on July 17, 2000. See Gross Compl. ¶¶ 12, 26. That interpretation is plausible given the language of the Joint Statement  "the DM 5 billion contribution of German companies shall be due and payable[.]" Furthermore, that interpretation is in keeping with Plaintiffs' counsel's declaration that the "deferral period" anticipated in the Joint Agreement did not intend to "diminish the economic value of German [I]ndustry's DM 5 billion obligation by discounting it into the indefinite future without the payment of interest." Neuborne Decl. ¶ 82. In fact, at oral arguments, on May 25, 2004, Professor Burt Neuborne, Plaintiffs' counsel, stated that it was Plaintiffs' understanding that "legal peace" for German Industry would take approximately six months. As such, on July 2000, Plaintiffs assumed that legal peace would take effect by January 2001. Unfortunately, due to circumstances beyond any of the parties' control, another court[6] refused to immediately grant dismissals and the German Bundestag could not declare "legal peace"  as required under section 17(2) of the Law on the Creation of a Foundation "Remembrance, Responsibility and Future" (hereinafter, the "Foundation Law")  until May 30, 2001. German Industry began to deposit substantial sums into the Foundation shortly thereafter, but final payments on the principal amount were not made until December 2001, almost a year after Plaintiffs' anticipated deadline.
On the other hand, the Schwartz Lee Complaint avers that the interest calculations should be made effective on or about December 14, 1999, when according to Plaintiffs, Treasury Deputy Secretary Eizenstat communicated to Plaintiffs' counsel that both the German Government and German Industry accepted a prior counteroffer of "10 billion DM present value settlement [.]" Schwartz Lee Compl. ¶¶ 24-26. Nevertheless the strength of that interpretation is mitigated by Mr. Eizenstat's comment, to the German Bundestag on February 16, 2000, referring to the parties' efforts as a "current draft." Schwartz Lee Compl., Ex. 13 at 4. The strength of Schwartz Lee's argument is further diminished by Plaintiffs' counsel's own admission that "[b]y March, 2000, it became apparent to counsel that it would be impossible to reach agreement on an allocation formula without the addition of supplemental funds. Failure to agree on an allocation formula threatened the entire enterprise." Neuborne Decl. ¶ 81. This indicates that no firm agreement had been reached on or about December 14, 1999.[7]
*243 Independent of Plaintiffs' positions, on February 16 and 17, 2000, Treasury Deputy Secretary Eizenstat stated that "it is critically important that the German companies deposit their DM 5 billion contribution as soon as possible in an interest bearing account." Schwartz Lee Compl., Ex. 13 at 13; see id., Ex. 14 at 3. Mr. Eizenstat urged the German Bundestag to incorporate this viewpoint in its domestic legislation instituting the Foundation. See id., Ex. 13 at 13 ("The legislation should support the agreement we have reached with Count Lambsdorff and the [German Industry] on this point."). However, the eventual Foundation Law remained silent on the interest issue. Instead, that German law simply required of German Industry DM 5 billion payable to the Foundation upon the Bundestag's determination that legal peace exists. See id., Ex. 17, § 3(2)(1) at 2.
Defendants counter that the Joint Statement only required German Industry to make a maximum "interest payment" of DM 100 million and that obligation was met. According to Defendants, the principal and interest obligations were remitted to the Foundation beginning in June 2001 shortly after the German Bundestag found that legal peace had been established on May 30, 2001. See Defs.' Br. in Supp. at 10. Defendants allege, however, that the "interest" amount of DM 100 million was in fact not interest but instead additional principal after "it became evident that the agreed maximum of DM 10 billion was not going to be enough to achieve a political agreement on distribution." Id. at 5 (quoting Letter dated Mar. 22, 2002 from Dr. Manfred Gentz[8] to Ambassador Dr. Dieter Kastrup). Specifically reinforcing that view, Rainer M. Turmer, the "Ministerialdirektor" of the German Federal Ministry of Finance, wrote that
[t]he interest committed constitutes a hidden increase in the overall ceiling. It became necessary because our negotiation partners could not agree how to divide up the [F]oundation assets, which were limited unanimously in December 1999 to DM 10 billion. The increase to DM 10.1 billion brought a breakthrough in resolving the disputed points between the Polish delegation and the Jewish Claims Conference.
Valen Decl., Ex. H at 1-2. German Industry stands firm that its interest obligations have been fulfilled following section 4(d) of the Joint Statement. See id., Ex. F at 4.
These competing interpretations on the "interest issues" make premature any effort to decide the merits of the claims pursuant to a Rule 12(b)(6) motion to dismiss. Although Plaintiffs argue that Defendants'"subjective reservations concerning the real meaning of the terms `interest' and `at least,' as used in the Joint Statement are legally irrelevant[,]" the same argument holds water with regard to Plaintiffs' own subjective interpretations of the interest provisions in the Joint Statement, which is discussed in depth below. See Neuborne Decl. ¶ 75; see also, infra, § V(A).
At this stage, if the Court were to properly entertain the merits of the interest issues, the Court could do so by converting the present motions by Defendant to motions for summary judgment. That, however, is not necessary here because the Court is convinced once again that the issues here, as in Frumkin, are nonjusticiable. *244 Before tackling the arguments as to justiciability, the Court will address a subordinate matter raised by Defendants in their motions.

IV. Res Judicata

The Full Faith and Credit Act, 28 U.S.C. § 1738, requires that "a federal court must give to a state-court judgment the same preclusive effect as would be given under the law of the State in which the judgment was rendered." Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). Correspondingly, Defendants argue that the doctrine of res judicata  also commonly referred to as claim preclusion  should bar the actions here. On May 23, 2002, a California citizen filed a similar action in Widerynski v. Deutsche Bank AG, No. BC274449 (Cal.Sup.Ct.), alleging, inter alia, that the same defendants named in the Schwartz Lee Complaint failed to timely contribute the agreed sum of DM 5 billion, thereby misappropriating interest due to the survivors of Nazi atrocities. See Valen Decl., Ex. D. The action was premised on the alleged violation of a California state statute, Business & Professions Code § 17200 et seq., and the California state court ruled primarily that the state statute could not "be applied by a California court to remedy out-of-state injury caused by out-of-state conduct." Id., Ex. E, ¶ 1 at 4. In addition, however, the court dismissed the Widerynski complaint with prejudice on grounds of international comity. The Widerynski court concluded that the German Government has "exclusive supervision of the Foundation and on the exclusive postwar intergovernmental resolution of matters arising out of the Nazi era."[9]Id., ¶ 5(d) at 7. The decision was not appealed.
In order for res judicata to apply, the claims in the latter action must be identical to the ones presented in the former action. As long as the claims are based on the same factual transaction, that requirement is met. Here, the interest issues, in whatever shade they are presented, all arise from the same communications and purported agreements concerning the appropriate timing and payment of interest on the part of German Industry raised by Widerynski. Plaintiffs do not argue to the contrary, therefore, the first requirement for res judicata to apply is satisfied.
Although the claims are identical, res judicata only binds those parties that litigated the prior action. Clearly, strangers to the prior proceeding cannot be bound by the prior decision.[10] However, *245 in Richards v. Jefferson County, 517 U.S. 793, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996), the Supreme Court stated that "[m]ost notably, there is an exception when it can be said that there is `privity' between a party to the second case and a party who is bound by an earlier judgment." Richards, 517 U.S. at 798, 116 S.Ct. 1761. Richards also stated that "although there are clearly constitutional limits on the `privity' exception, the term `privity' is now used to describe various relationships between litigants that would not have come within the traditional definition of that term." Id. (citing Restatement (Second) of Judgments, ch. 4 (1980)).
Defendants seek to exploit the liberalized interpretation given to the term privity and argue that Plaintiffs are in privity with the California plaintiff, Widerynski. If so, res judicata would attach the California ruling to Plaintiffs, irrespective of whether this Court agrees with the Widerynski decision, and obligate this Court to give full faith and credit to the prior decision. Although Defendants point out that the California plaintiff was represented by the same counsel  Michael D. Hausfeld  who currently represents Schwartz Lee and Lee and who signed the joint briefs in opposition here, this Court will not adopt the novel position that individual plaintiffs  without a legal relationship or one akin to such  are bound by the rulings made on another plaintiff's prior claims.
The Restatement (Second) of Judgments, ch. 4, which was cited in Richards, speaks to relationships wholly different from that between Widerynski and Plaintiffs. In § 40 of that Restatement, "Persons Agreeing to Be Bound by Adjudication Between Others," decisions are cited wherein "preclusion ha[d] been imposed on the basis of implied agreement." Restatement (Second) of Judgments § 40 rpt. notes. However, the Restatement makes clear that "no such [implied] agreement should be inferred except upon the plainest circumstances." Id. § 40 cmt. b. Here, Defendants do not aver that an agreement existed between Widerynski and Plaintiffs whereby Plaintiffs were to be "bound by the determination of issues necessarily resolved in the action between" Widerynski and Deutsche Bank AG et al. Id. § 40 cmt. a, illus. 2; see also id. § 40 cmt. b, illus. 3. Section 62 of Restatement (Second) of Judgments, ch. 4, is similarly inapplicable. Although § 62 provides exceptions to the general rule "that a person who is not a party to an action is not bound by the judgment in that action," none of those exceptions are evident here. Id. § 62 cmt. a. Plaintiffs were not "represented" by or involved in "privity"[11] relationships  "a variety of pre-existing legal relationship"  with Widerynski, nor were Plaintiffs involved in the Widerynski action "in a way that f[e]ll short of becoming a party but which justly should result in [their] being denied opportunity to relitigate the matters previously in issue." Id. No other sections of that Restatement is remotely applicable here. Consequently, the second element necessary to invoke res judicata is not met and Defendants' claim preclusion argument fails.[12]

*246 V. Political Question Doctrine

Plaintiffs allege primarily that the Joint Statement is a bilateral contract fully enforceable by this Court. "[A]t bottom the Joint Statement is a private contract between and among private parties to terminate pending litigation in return for a substantial, but deferred, financial consideration [.]" Pls.' Br. in Opp. at 8. Plaintiffs argue that because they have upheld their end of the bargain with the necessary dismissals in U.S. courts and allegedly Defendants have not by failing to remit the agreed upon interest payments to the Foundation, this Court can fully enforce the terms of the Joint Statement.
In addition, Plaintiffs allege that "repeated representations [were] made to American judges by agents of the seventeen corporate Defendants that induced the American courts to grant leave to dismiss numerous cases affecting hundreds of thousands of litigants." Id. at 18. According to Plaintiffs, these "court-centered representations" are judicially "enforceable obligations" that "cannot possibly be barred under the political question doctrine." Id. Specifically, as to this Court, Plaintiffs argue that German Industry promised "to pay appropriate interest." Neuborne Decl. ¶ 29 n. 4 at 12. Defendants counter that whatever the merits of Plaintiffs' claims, they are nonjusticiable.

A. Representations to American Judges

Before delving into whether the political question doctrine renders Plaintiffs' claims nonjusticiable, the Court takes issue with Plaintiffs' corollary contention that Defendants' promise to make appropriate interest payments induced this Court to dismiss past relevant actions. Clearly, there has been and continues to be a bona fide dispute over when and how much interest is owed by German Industry to the Foundation. That dispute, detailed above, led to the Court's opinion in In re Nazi Era Cases Against German Defendants Litigation ("Nazi Era Cases II"), 213 F.Supp.2d 439 (D.N.J.2002), and is the basis of the suits here.
In Nazi Era Cases II, plaintiffs "asked the Court to interpret the parties' rights and obligations under the German Foundation law, and have asked the Court to order German Industry to make additional payments into the Foundation." Nazi Era Cases II, 213 F.Supp.2d at 442. Plaintiffs there "asked the Court to exercise its power both pursuant to Fed.R.Civ.P. 60(b) and pursuant to an alleged reservation of jurisdiction" embodied in its grant of dismissal in Nazi Era Cases. Id. Although the Court concluded that it did not retain jurisdiction, the Court reviewed "the circumstances behind Plaintiffs['] request for dismissal." Id. at 449.
In Nazi Era Cases, the Court permitted the voluntary dismissal with prejudice of the actions of putative class members after concluding that notice was not required to those members under Federal Rules of Civil Procedure Rule 23(e). Dismissal of those actions required court approval, however. See Nazi Era Cases, 198 F.R.D. at 439. Because the putative class members' claims of forced labor and suffering were against German Industry, the then recently delineated terms embodied in the Foundation entitled those members to compensation in return for "legal peace" for German Industry. As such, counsel for the putative class members sought dismissal and the Court was required to undertake a review to "ensure that the representative plaintiffs ha[d] not settled or dismissed their claims to the prejudice of a prospective class prior to certification, and [to] ensure[ ] that the class action is not being used by plaintiffs to secure a collusive private settlement." Id.
*247 The Court was fully aware that the real possibility of collusion "stems partially from the fact that plaintiff's counsel typically serves as the negotiator on behalf of the named plaintiff and the asserted class." Id. The concern was that" `absent appropriate judicial inquiry ... [a] plaintiff's attorney may accept an insufficient judgment for the class in trade for immediate and certain compensation for himself in the form of legal fees deducted from the total available funds proffered by defendant.'" Id. (citing Magana v. Platzer Shipyard, Inc., 74 F.R.D. 61, 65 (S.D.Tex.1977) (quoting Foster v. Boise-Cascade, Inc., 420 F.Supp. 674, 686 (S.D.Tex.1976))). As such, the Court determined that "[w]hen focusing on the possibility of collusion, a court should conduct a careful, factual inquiry into the terms of the settlement, particularly the amount paid the plaintiff in purported compromise of his individual claim and the compensation to be received by plaintiff's counsel." Id. (citing Shelton v. Pargo, Inc., 582 F.2d 1298, 1315 (4th Cir.1978)). But, the Court was mindful that it "may accept as sufficient counsels' representations that there has been no collusion or bad faith underlying their motivation in dismissing the class claims" as long as there is no evidence to the contrary. Id. at 440 & 443 (citing In re Towers Fin. Corp. Noteholders Litig., No. 93 Civ. 0810(WK)(AJP), 1993 WL 492609, *1, 1998 U.S. Dist. LEXIS 1657, *1 (S.D.N.Y.1998)) (emphasis added). There was no such evidence to the contrary and the Court effectively accepted plaintiffs' counsel's representations  representations that the class members were willing to accept the terms of the Joint Statement, even though all the details were not completely resolved, in order to bring about legal peace for German Industry in a timely manner so that the Foundation could be funded in due course.
In fact Professor Neuborne submitted a supporting declaration which devoted its penultimate paragraph to the payment of monies into the Foundation. Under the penalty of perjury, he declared, in full, that
[t]he German government has made its initial payment of 2.5 billion DM on schedule, and is scheduled to make its second 2.5 billion DM payment by the end of the year. German industry is publicly committed to making its payment of 5 billion DM, with appropriate interest, to the Foundation as soon as the cases pending in American courts are dismissed. While I deplore the refusal of German industry to place its contribution in the Foundation until all dismissals have taken place, I am confident that the full 5 billion DM will be forthcoming as soon as the cases are dismissed.
Neuborne Decl., Ex. 1, ¶ 15 (emphasis added). Professor Neuborne's lack of precision regarding German Industry's interest obligations is self-evident from that declaration. He spoke of "appropriate interest" owed by German Industry. See also id., Ex. 3 at 25:6-8 ("[T]hey stand behind the promise that there will be 5 [b]illion [DM] with appropriate interest when the cases [a]re dismissed."). Those are the very words he now claims German Industry used to misrepresent interest obligations to this and other American courts in order to "induce[ ]" the dismissal of actions which would provide German Industry with legal peace. Those are also the same words that this Court used when describing its understanding of the interest issue on November 13, 2000. See id. at 15:6-9 ("It's also my understanding that German[ ] industry is publicly committed to making it payment of five billion DM with appropriate interest to the Foundation as soon as the cases pending in American courts are dismissed.") (emphasis added). Therefore, the Court is puzzled as to how German Industry can be held to task for allegedly submitting arguably indefinite *248 language to this Court,[13] when Plaintiffs' counsel did the same and the Court accepted those terms without objection from Plaintiffs.
Furthermore, Plaintiffs' counsel recognizes that the interest issue is patently ambiguous. In fact, Professor Neuborne acknowledged that "[t]he language in section 4D of the [J]oint [S]tatement" "is obviously read in two different ways. I read it as requiring them [German Industry] to pay the interest. [German Industry] read[s] it as requiring them to pay interest only from the date that legal peace has been achieved." Valen Decl., Ex. A at 61:11-18. Professor Neuborne also stated that "reasonable people can disagree" over the interest issue embodied in section 4(d) of the Joint Statement. Id. at 108:2-7; 109:9-16. Plaintiffs' counsel's conclusion that more interest is owed is premised on his "belie[f]" and assumptions. Professor Neuborne's declaration to the Court is laced with admissions that no concrete understanding was reached between the parties concerning the interest issue when this Court issued the Nazi Era Cases decision in late 2000. For example, he stated that "[r]epresentatives of the victims assumed that the DM 5 billion figure represented the economic value of the committed funds as of December 14, 1999" and Professor Neuborne "assumed that defendants' DM 5 billion principal obligation would be valued as of December 14, 1999 [.]" Neuborne Decl. ¶¶ 82, 87 (emphases added). The patent ambiguity over the interest issue contradicts Plaintiffs' current corollary position that German Industry induced this and other American courts to dismiss the relevant actions based on misrepresentations concerning its interest obligations. Clearly German Industry made no misrepresentation to this Court as to any definable interest obligation. The Court will now address Plaintiffs' central argument that the Court should enforce the Joint Statement as it would a "classic bilateral contract."

B. Contract Enforcement

The classic bilateral contract that Plaintiffs want this Court to enforce is the Joint Statement.[14] The Joint Statement places the Foundation as the "exclusive remedy and forum for the resolution of all claims that have been or may be asserted against German companies arising out of the National Socialist era and World War II." Schwartz Lee Compl., Ex. 15 at 3. Nevertheless, the Joint Statement outlines in its fourth section that the "participating Governments and other participants [were required to] proceed as follows[.]" Id. § 4 at 4. What "follows" is a series of directives, including, at § 4(d), the principal and interest contributions required of the German Government and German Industry. See id. § 4(d) at 5. The Joint Statement did not delegate, however, to the Foundation a similar jurisdictional authority over those § 4 directives that it previously recited concerning the World War II claims. As such, Defendants' interpretation that the Joint Statement itself provides that the *249 interest obligations are properly decided by the Foundation appears incorrect. Otherwise, the other directives listed in § 4 of the Joint Statement should also rest in the Foundation's "exclusive remedy and forum[.]" However, that conclusion is tenuous at best from a review of the other directives.
For example, § 4(b) requires that "Germany and the Government of the United States ... will sign an Executive Agreement. Such agreement contains the obligation undertaken by the United States to assist in achieving all-embracing and enduring legal peace for German companies." Id. § 4(b) at 4. Had there been a dispute between Germany and the United States over whether to sign the executive agreement called for by the Joint Statement, it cannot reasonably be said that the Foundation would be the proper or exclusive forum to settle that hypothetical dispute. The logical argument can also be extended to the final directive found in § 4 that "[t]he German Government will encourage German companies to open their archives relating to the Nationalist Socialist era and World War II." Id. § 4(i) at 6. Again, despite the fact that all claims against German Industry arising from World War II are exclusively within the jurisdiction of the Foundation as per the Joint Statement, it would be misplaced to insist that § 4(i)'s directive also falls within the Foundation's purview.
The Court extends this line of thinking to Defendants' current proposition that simply because the German Federal Ministry of Finance has spoken out in favor of Defendants' position does not mean that Plaintiffs' claims concerning the interest issue are not meritorious. How the Ministry of Finance's declaration came to be follows: In March 2002, on behalf of German Industry, Dr. Gentz wrote to Ambassador Dr. Dieter Kastrup,[15] the Chairman of the Board of Trustees of the Foundation, detailing that the Germany Industry had fulfilled its monetary obligations  "DM 5 billion plus DM 100 million"  to the Foundation. See Valen Decl., Ex. F at 7. Shortly thereafter, after having reviewed that correspondence, Dr. Michael Jansen, Chairman of the Board of Directors of the Foundation,[16] also wrote to Ambassador Dr. Kastrup confirming the DM 5.1 billion payment.[17]See id., Ex. G. And, on April 12, 2002, Mr. Turmer, on behalf of the German Federal Ministry of Finance, also wrote to Ambassador Dr. *250 Kastrup that "[t]he German Federal Government shares the view of the [Initiative]. The payment obligations of the [Initiative], totaling DM 5.1 billion, are outlined conclusively in [section 4(d)] of the Joint [Statement]." Id., Ex. H at 1. A second correspondence from the Ministry of Finance came directly from the Minister of Finance, Hans Eichel, who wrote to the U.S. Secretary of State Colin L. Powell that "[t]he German Federal Government shares the position of the [Initiative] that, under [section] 4(d) of the Joint Statement of July 17, 2000, the [Initiative] was obligated to pay a total of DM 5.1 billion as capped amount." Id., Ex. I, at 1. Dr. Eichel founded his authority on "section 8 paragraph 1 of the Foundation Law[,]" which he interpreted as providing that "the Foundation is subject to legal oversight by the Federal Ministry of Finance." Id.
Clearly, the German Bundestag's implementation of the Foundation Law provides that the "Foundation is subject to legal oversight by the Federal Ministry of Finance." See Schwartz Lee Compl., Ex. 17, § 8(1) at 3. Therefore, the Court is obliged to accept the Federal Ministry of Finance's rulings as to issues properly before the Foundation. However, as explained above, it does not appear that either the Joint Statement or the Foundation Law[18] accorded the Foundation exclusive jurisdiction over issues arising out of interest payments owed to itself. Thus, while neither Mr. Turmer's letter dated April 12, 2002 nor the more recent letter dated July 24, 2002, expressing the same from Dr. Eichel, representing the Federal Ministry of Finance's view supporting Dr. Gentz's recitation that all monies owed to the Foundation by German Industry was wholly and promptly paid, may be definitive, they do explicate Germany's understanding of the interest issue. See Valen Decl., Ex. J.
However, Plaintiffs make a plausible argument that the interest issues here are not precisely claims arising out of World War II that are now in the exclusive jurisdiction of the Foundation pursuant to the Joint Statement.[19] But, simply because the interest issues may not be exclusively within the purview of either the Foundation or, on appeal to, the German Federal Ministry of Finance, the Court is not conferred with the unique capacity to entertain these issues. Instead, the determination as to the merits of Plaintiffs' claims must be eschewed if the Court is faced with a political question that renders Plaintiffs' claims nonjusticiable.
Earlier, the Court noted that it has diversity jurisdiction over the dispute concerning interest payments owed to the Foundation by German Industry. Nevertheless, "[t]he political question doctrine holds that a federal court having jurisdiction over a dispute should decline to adjudicate it on the ground that the case raises questions which should be addressed by the political branches of government." Iwanowa v. Ford Motor Co., 67 F.Supp.2d 424, 483 (D.N.J.1999) (citing Baker v. *251 Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Atlee v. Laird, 347 F.Supp. 689, 701 (E.D.Pa.1972) (noting that "even though a dispute may constitutionally be subject to the judicial power, if a political question is present, a federal court should decline to address the merits.")).
The doctrine of separation of powers prohibits the federal courts from excursions into areas committed to the Executive Branch or the Legislative Branch. Given that separation of powers, "the political-question doctrine restrains courts from reviewing an exercise of foreign policy judgment by the coordinate political branch to which authority to make that judgment has been `constitutionally committed.'" It is thus beyond the authority of the courts to interfere with the Executive Branch's foreign policy judgments.

In re Austrian & German Holocaust Litig., 250 F.3d 156, 163-64 (2d Cir.2001) (citations omitted) (emphasis added). Baker v. Carr provided that if any one of the following factors is "inextricable from the case[,]" the reviewing court must decline to address the nonjusticiable political question:
Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
Baker, 369 U.S. at 217, 82 S.Ct. 691. The Supreme Court cautioned, however, that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." Id. at 211, 82 S.Ct. 691. With regard to reparation claims arising out of World War II, numerous cases have dismissed these claims on the basis of the political question doctrine. See, e.g., Kelberine v. Societe Internationale, 363 F.2d 989, 995 (D.C.Cir.1966); Iwanowa, 67 F.Supp.2d at 489; Burger-Fischer v. DeGussa AG, 65 F.Supp.2d 248, 282-85 (D.N.J.1999).
Previously, this Court in Frumkin reiterated that the "political question doctrine does not abrogate the existence of federal judicial power, it merely limits its exercise, so that even if a court has the constitutional power to adjudicate a dispute, if the dispute presents a political question, it should decline to do so." Frumkin, 129 F.Supp.2d at 375 (citations omitted). In Frumkin, this Court granted the motion of German corporate defendants to dismiss, in part, because the plaintiff's claims presented nonjusticiable political questions.[20] The Court concluded that "the claims of individual plaintiffs against private German defendants were no longer properly justiciable in American courts." Id. at 378 (citing Burger-Fischer, 65 F.Supp.2d at 284-85; Iwanowa, 67 F.Supp.2d at 483-89). Before reaching that conclusion, the Court summarized fifty-five years of executive and legislative efforts concerning matters of Holocaust-era restitution. This Court noted that

*252 [t]he position of the United States government recommending dismissal is motivated by the ... concern[ ] [that] matters of Holocaust-era restitution are best resolved through dialogue, negotiation, and cooperation as opposed to prolonged and uncertain litigation[.]
Frumkin, 129 F.Supp.2d at 380; see Nazi Era Cases II, 213 F.Supp.2d at 452 ("[T]he Court would urge Plaintiffs to review its decision in Frumkin, and question whether it is desirable to abandon the arguably flawed but functioning Foundation in favor of highly uncertain litigation."); see also Neuborne Decl., Ex. 3 at 46:10-13 ("It's the United States' policy that [some measure of justice to Holocaust victims] can best be done through cooperation and dialogue rather than by litigation, which is time consuming and uncertain at best.") (Mr. D.J.Anderson). That concern is no less evident here, when the core issue is not whether restitution is proper, but how much restitution, namely in the form of interest, was agreed upon.
Clearly, intergovernmental efforts have continued beyond the Joint Statement and Executive Agreement. For example, in a related action filed in the Eastern District of New York, Judge Weinstein, in dismissing plaintiffs' complaint upon Professor Neuborne's motion to withdraw, noted that
[p]artly in response to the instant proceedings, the German and American governments, the Foundation, and interested individuals have addressed or are in the process of addressing the [interest disputes] and are expected, based upon their submissions in this court and elsewhere, promptly to rectify [ ] inappropriate conduct, to ensure against future misconduct, and to speed payment of victims in appropriate amounts.
Ukrainian Nat'l Assoc. of Jewish Former Prisoners of Concentration Camps & Ghettos v. U.S., 178 F.Supp.2d 312, 314 (E.D.N.Y. Dec.13, 2001). Additionally, in a letter dated April 18, 2002 to Deputy Secretary of State Armitage, the Vice-Chairman of the Board of Trustees, Dr. Lambsdorff, wrote:
Dear Mr. Secretary, dear Richard,
I wish [to] come back to our friendly and open discussion on April[ ] 5 concerning the issue whether the [Initiative] owes additional interest above the 100 million DM already transferred to the Foundation in addition [to] the principal of 5 billion DM.
At the margin of today's meeting of the Board of Trustees, I have agreed with Ambassador Bindenagel to attempt to resolve this issue by an exchange of letters between us, the basis of which will be the letters by the [Initiative], by the Foundation's Board of Directors and by the German Ministry of Finance to the Chairman of the Board of Trustees. These letters have been forwarded to the U.S. Government through diplomatic channels.

I have charged my chief of staff Mr. Grier to work out drafts together with Ambassador Bindenagel with a view to settle this cumbersome issue before the Presidential visit in Germany on May.
Neuborne Decl., Ex. 18 at 6-7 (emphases added).
In the undated letter to Dr. Lambsdorff, Mr. Armitage responded unequivocally that "[t]he policy of the United States has been that the proper venues for addressing issues concerning the Foundation are in the Foundation or through U.S.-German diplomacy." Valen Decl., Ex. J at 1. In the very next sentence, he concluded that "the U.S. Government believes that matters concerning interest payments should be resolved as a political matter in these domains, not by the courts." Id. The State Department anticipated, nevertheless, that there could be challenges in U.S. courts on this issue by stating that "[w]ith respect to *253 any U.S. court cases that may be brought against German entities on the question of pre-transfer interest, the U.S. Government will be guided by this view." Id. Thus logically, according to Mr. Armitage, the highest ranking member of the Executive Branch to speak directly on this issue, "matters concerning interest payments" are a proper subset of "issues concerning the Foundation[,]" which may be presented to, but should not be resolved by, the courts.
Finally, on February 19, 2004, the Court received correspondence from the German Ambassador to the United States, Wolfgang Ischinger, who wrote urging the dismissal of the Gross and Schwartz Lee Complaints. On behalf of Germany, Ambassador Ischinger stated that "the present claims asserted by plaintiffs regarding interest, must be resolved in Germany pursuant to the mechanisms set forth in the Berlin Agreements and the Foundation Law." Specifically, Ambassador Ischinger referred to § 8(1) of the Foundation Law which states that the "Foundation is subject to legal oversight by the Federal Ministry of Finance."
Notwithstanding this Court's reservations over whether the Ministry of Finance does in fact maintain exclusive jurisdiction over the interest issues, the Court is convinced that the political question doctrine precludes adjudication of whether additional interest is owed.[21] That both Germany and the United States have committed the resolution of this issue to diplomacy over litigation is supported not only by the above correspondence but, more importantly, by history. In Frumkin, this Court noted that "[c]laims for war reparations arising out of World War II have always been managed on a governmental level." Frumkin, 129 F.Supp.2d at 376; see Iwanowa, 67 F.Supp.2d at 486 ("The executive branch has always taken the position that claims arising out of World War II must be resolved through government-to-government negotiations. Thus, allowing private litigation of war-related claims would express a lack of respect for the executive branch."). In reviewing other cases, this Court also noted that "the post-war claims settlement regime had been exclusively constructed by the political branches...." Frumkin, 129 F.Supp.2d at 377. Frumkin further noted that through the Executive Agreement, the Executive Branch demonstrated a commitment to resolve claims like Frumkin's on an intergovernmental level "in keeping with almost six decades of treaties and agreements that have been orchestrated by the political branches of government, and committed to Germany for implementation." Id. at 388.
The current dispute over interest is simply the coda in the long drama of disagreements concerning Holocaust-era restitution. Although the terms of the Joint Statement hammered out between counsel for the surviving Holocaust victims, the German Government and German Industry (and facilitated by the U.S. Government) sought to bring an end to legal disputes in the United States, it is clear that financial closure remains elusive. For almost 60 years now, U.S. courts have held consistently that the political question doctrine made Holocaust-era claims nonjusticiable. It follows that the same approach should be adopted here. The interest dispute is but a part of the prior nonjusticiable claims. Because diplomatic efforts led to both the Joint Statement and the Executive Agreement, which effectively fathered the Foundation, and which in turn has and will redress the individual claims, the Court sees no reason why diplomacy *254 again cannot resolve what could be the last link in what has historically been a political catena. As such, this Court agrees with Widerynski that a complaint's attack "on the exclusive postwar intergovernmental resolution of matters arising out of the Nazi era" should be dismissed. In light of Mr. Armitage's letter, if the Court were to instead rule on the merits here, it would display a "lack of respect due coordinate branches of government" and possibly embarrass the Executive Branch; both results would run afoul of Baker v. Carr.
Plaintiffs' very real concern that this Court  and the U.S. court system in general  is their "last resort," while tactical here, is inaccurate. The refusal of the Court to entertain the merits of Plaintiffs' claims, on the grounds that those claims are nonjusticiable as a result of the political question doctrine, provides, as has always been available, Plaintiffs with an opportunity to impress their arguments upon the other branches of the federal government to resolve the interest issue. No statement on behalf of the United States presented to the Court indicates that the U.S. Government agrees wholly with Defendants' merit arguments or with the German Federal Ministry of Finance's position. In fact, in the same letter cited above that opined that U.S. courts are not the proper "domain[ ]" for the interest issue, Deputy Secretary of State Armitage wrote that "[t]he U.S. Government has no independent information that conclusively resolves disagreements surrounding the interest issue." Valen Decl., Ex. J at 2. Moreover, as expressed by Professor Neuborne at oral arguments on May 25, 2004, he "wears two hats:" In addition to his role as Plaintiffs' counsel, he also occupies one of two U.S.-appointed seats on the Board of Trustees of the Foundation at the pleasure of the President of the United States. If there is to be a resolution of the interest issue, it must be at an intergovernmental level.

Conclusion
In Nazi Era Cases II, the Court concluded that it was "distressed by Plaintiffs' allegations that German Industry may be shirking its obligations, [but] it can not allow those allegations to trump basic tenets of jurisdiction [.]" Nazi Era Cases II, 213 F.Supp.2d at 452 (emphasis added). Similarly, here, the Court can not ignore limits on the exercise of federal judicial power despite the same allegations. Thus, for the foregoing reasons, Defendants' motion to dismiss on the ground of nonjusticiability is granted.
An appropriate order follows.
NOTES
[1] The Court recognizes that the term "slave labor" does not accurately describe the overarching Nazi goal to "exterminat[e] through labor." Neuborne Decl., Ex. 3 at 31:1-10.
[2] That amount is contradicted by a statement by David J. Anderson, Director of Federal Programs Branch for the United States of America, to this Court on November 13, 2000. He stated that Germany has provided "[US] $100 billion, present value, in compensation restitution and pension programs" for Nazi-era atrocities to Holocaust victims. Neuborne Decl., Ex. 3 at 46:21-24.
[3] The "Foundation Initiative of German Enterprises" (the "Initiative") represents German Industry. The Initiative was a signatory to the Joint Statement. The Joint Statement provides that the Initiative are "German companies that founded the initiative to establish a foundation, which have since been joined by thousands of other German companies[.]" Schwartz Lee Compl., Ex. 15 at 2.
[4] The Initiative is an "unincorporated association existing under German law managed by seventeen major German corporations." Gross Compl. ¶ 5. All seventeen corporations are named as defendants in the Gross Complaint and the two corporate entities named in the Schwartz Lee Complaint also are part of the Initiative. Plaintiffs allege that all seventeen individual German corporations are alter egos of the Initiative. For purposes of this Opinion, the Court will refer collectively to all the named defendants as German Industry, as members of the Initiative are a subset of German Industry; however, the Court does not take a stance as to the legal nature of the Initiative.
[5] In contrast, Professor Neuborne stated previously that he believes that German Industry is "obliged to pay an additional interest component for the six month delay in the achievement of legal peace." Valen Decl., Ex. A at 61:3-6.
[6] See In re Austrian & German Holocaust Bank Litig., No. 98 Civ. 3938(SWK), 2001 WL 228107, 2001 U.S. Dist. LEXIS 2311 (S.D.N.Y. Mar. 7, 2001) (denying plaintiffs' voluntary motion to dismiss the Consolidated Class Action Complaint), mandamus granted, 250 F.3d 156 (2d Cir. May 17, 2001).
[7] The Court also notes that Professor Neuborne in a letter dated October 24, 2001 to the Honorable Jack B. Weinstein of the United States District Court for the Eastern District of New York stated that "I believe that additional interest payments are due from the [Initiative], to be calculated from the signing of the Foundation agreement in July, 1999." See Valen Decl., Ex. C at 2. That letter sought the dismissal of a continuing action there in order to assist in bringing about legal peace for German Industry. Professor Neuborne, to his credit, continued that "the precise date from which interest runs on the obligation of the [Initiative] is the subject of a serious dispute." Id. at 2-3.
[8] Dr. Gentz wrote on behalf of the Initiative. As the CFO of DaimlerChrysler, Dr. Gentz has been the authorized agent for the Initiative. In fact, he signed the Joint Statement on behalf of the Initiative.
[9] The issue of whether the German Government in fact has exclusive jurisdiction over the interest issues by way of its control over the Foundation will be discussed below. The Court notes that the Foundation's responsibility lies primarily in its efforts to distribute compensation to surviving Holocaust victims, not in how monies, including interest, owed it are calculated. Therefore, Defendants' position that the German Government, specifically via the Ministry of Finance, has exclusive jurisdiction over the interest issues is debatable.
[10] In Widerynski, that court noted that Widerynski's individual complaint would violate other Foundation beneficiaries of "their right of notice, opt out, and opportunity to be heard." Valen Decl., Ex. E, ¶ 2(a). The Widerynski court cited to Bronco Wine Co. v. Frank A. Logoluso Farms, 214 Cal.App.3d 699, 262 Cal.Rptr. 899 (5th Dist.1989), which expressed concern that non-parties who were awarded restitution damages by the lower court may nevertheless have "elect[ed] to waive such opportunity [to receive a judgment in their favor], preferring not to jeopardize an ongoing beneficial business relationship" with the defendant. Bronco, 214 Cal.App.3d at 719, 262 Cal.Rptr. 899. Similar considerations are plausible here. Other Foundation beneficiaries may not want the good will and work of the Foundation compromised by the lawsuits here.
[11] The Restatement also provides that "the term `privity,' unless it refers to some definite legal relationship such as bailment ... or assignment, is so amorphous that it often operates as a conclusion rather than an explanation." Restatement (Second) of Judgments § 62 cmt. c.
[12] Res judicata also requires that a final decision on the merits in a prior action is required. Naturally, there is a dispute as to whether the California Superior Court in fact retained jurisdiction. Because, the issue of whether claim preclusion applies is properly disposed of because privity does not exist between Plaintiffs and Widerynski, the Court declines to address this final element.
[13] A review of the November 13, 2000 hearing, in which this Court agreed to dismiss the putative class actions without notice to all the members, reveals no instance when German Industry averred to the Court its interest obligations. The only promise made to the Court with regard to money was that the then "shortfall of somewhere between 1.5 and 1.6" billion DM of the principal obligation "will be there[.]" Neuborne Decl., Ex. 3 at 26:4-7; 42:18-24.
[14] At the outset, the Court notes that contrary to Plaintiffs' assertions, the Joint Statement is not a contract between "private parties." A review of the signatories to that agreement makes that evident. The Joint Statement was executed by German Industry, as well as eight different nations, including the United States and the Federal Republic of Germany.
[15] Ambassador Dr. Kastrup is Germany's Permanent Representative to the United Nations and he chairs the Board of Trustees of the Foundation. The Vice Chairman of that Board is Dr. Otto Graf Lambsdorff, a former German Federal Minister of Finance and the German Federal Chancellor's, Gerhard Schroder's, personal representative to the Board of Trustees of the Foundation. See Neuborne Decl., Ex. 8, ¶ 7; Valen Decl., Ex. C at 2.
[16] The three-person Board of Directors "that, under German law, directs the day-to-day operation" of the Foundation were elected by the Board of Trustees of the German Foundation. Neuborne Decl., Ex. 8, ¶ 8. "Dr. Jansen, having received the highest number of votes, was designated as Chair." Id. He is not a member of the Board of Trustees of the German Foundation; however, the Foundation Law provides that the "Board of Directors shall represent the Foundation, both in judicial and extrajudicial matters." Schwartz Lee Compl., Ex. 17, § 6(3) at 3.
[17] Plaintiffs dispute the validity of the positions proffered by Drs. Gentz and Jansen. Professor Neuborne who holds one of two seats on the Board of Trustees of the Foundation allocated to the United States asserts that the full Board of Trustees has yet to vote on the interest issue. Neuborne Decl. ¶ 29. Instead, the "representative of the Ministry of Finance ... forbade the Board of Trustees of the [Foundation] from voting on the issue, arguing that the Ministry of Finance had exclusive legal authority to resolve the issue on the Foundation's behalf." Id. ¶ 27.
[18] The Court is mindful that the provided translation of the Foundation Law is an "informal translation" and that the "German text is authoritative." See Schwartz Lee Compl., Ex. 17 at 1-8.
[19] At oral arguments, on May 25, 2004, Professor Neuborne repeated that he believed that the interest issues should have been properly put forward to the vote of the full Board of Trustees of the Foundation. See, supra, n. 17. In essence, Professor Neuborne argued to the Court that the Foundation is in fact the proper forum for the resolution of the interest issues if the entire Board of Trustees is permitted to rule on the merits. The incompatibility of this position with the one explained in the text above is noted, but is extrinsic in light of the Court's position with regard to the political question doctrine which follows.
[20] The Court also dismissed that action on international comity grounds. See Frumkin, 129 F.Supp.2d at 386-88.
[21] This conclusion obviates the need to address two other potential bases for nonjusticiability  the act of state doctrine and principles of international comity.